[Civil No. 3316.   Filed December 4, 1933.]

[27 Pac. (2d) 519.]

MUTUAL BENEFIT HEALTH AND ACCIDENT ASSOCIATION, a Corporation, Appellant, v. BENJAMIN R. FERRELL, Appellee.

478

Mr. G. W. Shute and Mr. Charles Bernstein, for Appellant.

Mr. M. L. Ollerton and Mr. A. David Latham, for Appellee.

LOCKWOOD, J.—Benjamin R. Ferrell, hereinafter called plaintiff, brought suit against Mutual Benefit Health and Accident Association, a corporation, hereinafter called defendant, to recover upon a certain policy for illness indemnity issued to plaintiff by defendant. The case was tried to a jury, which returned a verdict in favor of plaintiff in the sum of $2,942, and, after the usual motion for new trial was denied, this appeal was taken.

The material facts of the case, placing an interpretation on the evidence most favorable to plaintiff, as we must under the verdict of the jury and our familiar rule, may be stated as follows: On the fifth

day of July, 1929, defendant insured plaintiff against loss of time on account of disease, subject to the provisions and limitations of such policy. The premium, after the first installment, was to be paid quarterly in advance beginning on the first day of November, 1929. Shortly after taking out the policy, plaintiff had some slight illness, which never became serious enough to cause him to make a claim for indemnity, and had a conversation with Earl B. Brink, who was the resident manager of defendant, in which he complained of not being well, and asked Brink's advice as to what physician he should consult, whereupon Brink suggested Dr. E. L. Hicks, saying "he was our doctor." Plaintiff thereupon consulted Dr. Hicks in regard to such illness, paying him therefor. During the latter part of 1929, plaintiff again became ill, and under the terms of his policy was entitled to and received certain indemnity therefor. After a short treatment by Dr. Hicks, to whom he went without any further suggestion by Brink or anyone else, he returned to work apparently perfectly well, but some six weeks later became ill again. He again called Dr. Hicks, who treated plaintiff at his own home, visiting him there on various occasions, until about the 24th of February, at which time he was taken, at the advice of Hicks, to a certain private sanitarium, where he remained and was attended by Hicks until the middle of April. Shortly before that date, Hicks told him in substance that he had been greatly run down and on the verge of tuberculosis, but that in thirty days he would be well enough to return to work, and on April 15th Hicks made a written report to defendant as plaintiff's attending physician to the effect that with care he could go to work again in a couple of months. He also stated therein that plaintiff's respiration was weak, but that no tubercle bacilli had been found. On the 15th of April, and while plaintiff was in the sanitarium, he was visited by Brink.

The latter told him Dr. Hicks had made a report to the company, and that his disability was about over, and, after some discussion, plaintiff executed a certain document which reads as follows:

"Received of the Mutual Benefit Health & Accident Association, of Omaha, Nebraska, this day the sum of Five Hundred and No/100 Dollars ($500.00) in full settlement of any and all claims which have arisen or which may arise against said Association under Policy No. 12D-152128 issued to me by said Association on or about July 5, 1929 as well as any and all renewals thereof at any time issued.

"In consideration of the payment to me of the sum hereinbefore mentioned, I do hereby release and relinquish to said Mutual Benefit Health & Accident Association all my rights, title, claim, interest and demand, accrued or accruing, in and to said policy No. 12D-152128, and any and all renewals thereof, and by this act release, relinquish and discharge said Association from any and all liability of whatever kind or nature, if any, that now exists, or may hereafter exist, for or on account of the disability sustained or commencing about Jan. 30, 1930.

"It is expressly understood and agreed that the said Association has never, at any time, admitted any liability under said policy, or any obligation to pay any amount whatsoever for or on account of said disability, but has at all times denied, and at the time of making this compromise settlement and payment still denies any liability for said disability and the right of anyone to recover on this policy therefor.

"It is further understood and agreed, and I hereby expressly state that my knowledge of the facts concerning the claim and the conclusion reached by me in the acceptance of said sum hereinbefore mentioned has been derived separately and apart from any person or persons connected with or representing said Association, and that I have not been influenced in my action by any such person or persons.

"It is further understood and agreed that the payment to me of the above specified sum by the said Mutual Benefit Health & Accident Association, and the acceptance of said sum by me, is done in and as a

compromise, and that the same is and forever after shall be a bar to any suit at law or otherwise for anything whatsoever growing out of said policy or of any renewal thereof.

"Dated at Phoenix, Arizona, this 15 day of Apr. 1930.

"[Signed] BENJAMIN R. FERRELL [Seal]

"Witnesses: BEULAH V. FERRELL,

"E. B. BRINK,"

—and the $500 was paid to him. Plaintiff admitted signing the release, but stated he did so at the request of Brink and because the latter assured him it was merely for his (Brink's) protection, and that it would not cancel the policy or be a settlement in full, but merely up to the time it was estimated he could return to work. He stated that he did not read, or attempt to read, the release when it was handed him by Brink for signature, giving as his only excuse for not doing so that he relied on Brink's representations. A few days after that plaintiff left the sanitarium and went to his homestead near Buckeye, where he remained a short time, and then in company with his family went to New Mexico where he stayed until the last of October, then returning to his homestead. He remained there until about the 1st of December, when he went to the Veterans' Bureau at Albuquerque for examination, and was there informed by the physicians that he had been for some time afflicted with pulmonary tuberculosis, which was his first definite knowledge of that fact. Thereafter he continued with his brother by automobile to the northern part of New York, remaining there in his brother's home in the neighborhood of Saranac Lake until April, 1931, when he returned to his homestead near Buckeye. He stayed there until July, 1931, when he went to the Veterans' Hospital at Fort Whipple, being in the hospital until the 1st of March, 1932, when he again returned to his homestead. During all the time from April 15, 1930, up to the filing

of the action, he was totally disabled from pursuing his usual avocations by reason of his illness, and spent his time either traveling about the country, as has been stated, or resting either within or without his residence at the time, as advised by his physicians. He was not visited regularly during this time by any physician, but did repeatedly go to the office of some physician for consultation, except that, while he was at Whipple Hospital from the twelfth day of July, 1931, to the fifth day of February, 1932, he was admittedly confined continuously within doors, and required and received regular visits therein from a physician.

He had paid his insurance premiums as provided by the contract on November 1, 1929, and February 1, 1930, the next premium being due on May 1, 1930. Before he left Phoenix in April, 1930, he arranged with one G. M. 'Smith to pay the premiums due on May 1st. In the latter part of April Smith called at the office of the defendant in Phoenix to pay the premium for Ferrell and two premiums on certain policies for his own children. The money was paid to and accepted by someone in the office and a receipt duly issued therefor. Later on, and before plaintiff's next premium was due, Smith tendered payment thereof to Brink, but was told that the tender would not be accepted, and that the premium already paid as of May 1st would be returned to Ferrell as soon as they could discover his address. After some discussion, it was suggested by Brink that, since Smith had paid the May 1st premium, he should accept its return and apply the money on a policy of his own, which was done. Plaintiff made no claim for further indemnity until the spring of 1932, when he interviewed Hicks, apparently intending to use him as a witness. It was then about noon, and Hicks told him that he had a luncheon engagement with Brink, but would talk to him the next day after he had talked

with Brink, and, when plaintiff returned the next day, informed him in substance that he had better accept the settlement offered by Brink, for he would get no more.

This action was filed April 7, 1932, and plaintiff, after setting up the execution of the policy above referred to, alleged that he had become totally disabled so as to be continuously confined within doors, and had required regular visits by a physician ever since the third day of January, 1930, up to the time of the filing of the action. Defendant answered, admitting the execution of the policy, but pleading the release above set forth. Plaintiff replied, stating that the release was signed by him on the representation of Hicks, whom it was alleged was the physician and medical representative of defendant, that he did not have a permanent illness and would be able to resume work within thirty days, and further that it was represented to him that the document which he signed was merely an acknowledgment of the receipt of what was due him up to that date, and that it did not release defendant from any future liability, but that the policy remained in full force and effect without the payment of any additional premiums until he was able to resume his previous occupation. We think this is a sufficient statement of the facts for the purposes of the case.

There are some nine assignments of error, and we discuss the case from the standpoint of the questions of law raised by the record and these assignments.

Plaintiff alleged the execution of the policy and that he was entitled to certain benefits thereunder. Defendant answered, admitting the execution, but alleging that all claims of plaintiff had been settled and the policy canceled by a certain release. Plaintiff replied, admitting his execution of the release, but alleging (a) that he executed the same relying on the

false representations of defendant's physician as to his condition, and (b) that he did not know at the time that the document he executed was a release and settlement, but believed, relying on the representations of defendant's agent, that it was simply a receipt for payment of the indemnity then admittedly due or to become due to defendant. It is obvious that these two allegations of the reply are utterly inconsistent. If we are to take (a) as representing the facts, plaintiff knew that he signed a release, but did so because of misrepresentations made to him as to his physical condition. If we are to take (b) as true, he did not know that he signed a release. It is, of course, true that plaintiff may plead inconsistent matters in confession and avoidance of an answer, but the burden is on him to sustain such pleas by affirmative evidence, and it is obvious that in this case the proof necessary to sustain (a) will negative (b), while the proof necessary to sustain (b) must negative (a).

We turn, therefore, to the testimony of plaintiff in regard to the signing of the release. It appears on pages 50 to 52, inclusive, of the reporter's transcript of testimony. We need not quote it in full, but the only conclusion to be drawn therefrom is that he did not know he was signing a release. This is confirmed by the testimony of plaintiff's wife to the effect that Brink, defendant's agent, told plaintiff that the document signed was merely a receipt for the agent's protection with the company. We think under these circumstances that it was error for the trial court to submit to the jury any instructions at all in regard to the question of mutual mistake. If plaintiff did not know what he was signing, and did not intend to and would not have signed a release and cancellation of the policy, as both his and his wife's testimony intimates, it is immaterial whether Hicks was the company's physician and what repre-

sentations of fact in regard to plaintiff's condition were made by him. The cases of *Atchison etc. Ry. Co.* v. *Peterson,* 34 Ariz. 292, 271 Pac. 406; *Mutual Benefit Health & Acc. Assn.* v. *Pittman,* 39 Ariz. 218, 4 Pac. (2d) 1005, have no relation to the facts of this case as shown by plaintiff's own testimony. In both of these cases the plaintiff admitted that he signed a release with full knowledge of what it was, but claimed that he was induced to do so by false representations of the defendant's physician in regard to plaintiff's physical condition at the time. In the case at bar plaintiff denied in his testimony that he intended to sign any release or settlement in full or knew that the document he was signing was of that nature. Such being the case, plaintiff by his own testimony has shown that his first plea in confession and avoidance of mutual mistake cannot be sustained. The record shows that the case was submitted to the jury upon the theory of mutual mistake, and the instructions of the court upon the release were based upon that theory, and that alone. It is therefore necessary that the case be reversed and remanded for a new trial.

There are other questions raised by the assignments of error not absolutely necessary for the determination of this appeal, but, since they will in all probability arise upon a new trial, we consider them also.

The first is the plea of plaintiff that the release in question was obtained by fraud. The fraud alleged is a misrepresentation by defendant's agent Brink as to the nature of the release at the time it was signed by plaintiff. The only evidence in regard to the alleged misrepresentation is the oral testimony of plaintiff and his wife that they were informed by Brink that the document was merely a receipt for the money which it had just been agreed was to be paid plaintiff, while on the other hand Brink testified

that the nature of the instrument was fully explained to plaintiff at the time, and that he signed it knowing its full effect. It is, of course, the rule that, when a contract is sought to be enforced against a party, who admits that he entered into it, he may defend on the ground that his consent thereto was obtained through fraud, for fraud vitiates all transactions into which it enters. There are certain essential elements in actionable fraud. They are (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury. 26 C. J. 1062; *Moore* v. *Meyers*, 31 Ariz. 347, 253 Pac. 626. If the testimony of plaintiff as to what occurred when he signed the release is to be accepted as true, there is undoubtedly sufficient evidence to sustain the plea of fraud, so far as all except one of the elements thereof is concerned. That element is his right to rely upon the alleged representations. He testified in substance that, after considerable discussion as to how much money was then due and to become due him before he would be able to return to work, and after a sum of $500 had been agreed upon as compensation for that period, Brink handed him a document to sign which he stated was merely in the nature of a receipt for his (Brink's) protection with defendant, and that without reading it or without its being read to him he did sign it.

The question then arises as to whether under those circumstances he was entitled to rely upon Brink's representation of the nature of the instrument. It is the general rule that false representations are not actionable unless the hearer was justified in relying thereon in the exercise of common prudence and dili-

gence. *Brandt* v. *Krogh,* 14 Cal. App. 39, 111 Pac.
275; *Wheelwright* v. *Vanderbilt,* 69 Or. 326, 138 Pac.
857; 26 C. J. 1142. What is common prudence and
diligence varies in accordance with the circumstances
of the case, but it is generally held that, when a
party has an equal opportunity to read and examine
a contract with the other party, it is his duty to do
so, and, if he fails, he will not be permitted to avoid
it on the ground that he did not read it or supposed
it was different in its terms from what it really was.
As the Supreme Court of the United States said in
the case of *Upton* v. *Tribilcock,* 91 U. S. 45, 23 L. Ed.
203:

" . . . It will not do for a man to enter into a con-
tract and, when called upon to respond to its obliga-
tions, to say that he did not read it when he signed it,
or did not know what it contained. If this were per-
mitted, contracts would not be worth the paper on
which they are written. But such is not the law. A
contractor must stand by the words of his contract;
and, if he will not read what he signs, he alone is
responsible for his omission. . . . "

There are, it is true, many cases which make the
statement that, if the other party induces the signer
to sign the paper without reading it and to rely on
his statements as to the nature of the contract, the
signer may avoid the contract on the ground of fraud.
We think, however, it will be found upon an examina-
tion of the almost innumerable cases upon this ques-
tion that most of the decisions holding that, notwith-
standing the party had the opportunity to and did
not read the instrument, he may avoid it on the
ground of false representations, fall into two classes.
One is where it is admitted either by the pleadings
or by the presence or absence of evidence on behalf
of the party alleged to have committed the fraud that
such fraud was in fact committed. *Summers* v. *Alex-
ander,* 30 Okl. 198, 120 Pac. 601, 38 L. R. A. (N. S.)
787. The other is where there are special and

peculiar circumstances justifying the signer in relying upon the representations, such as the existence of a fiduciary relation between the parties, that the signer was illiterate or ignorant of the English language, or was ill or unable to understand the nature of the agreement and the like. Our leading case on the question of when one may rely on the representations of another is *Smith* v. *Mosbarger,* 18 Ariz. 19, 156 Pac. 79. In that case plaintiff alleged that he was feeble, in ill health, illiterate and uninformed in the English language, and unable to read and understand the contract at the time that he signed it, and we held that, when such circumstances existed, fraudulent representations as to the nature of the instrument would justify a court in declaring it ineffective. We did not, however, discuss or decide what the rule would be where the party setting up the false representations was of sound mind, though perhaps feeble in body at the time, was able to read and understand the English language, and did not sustain a fiduciary relation toward the other party. There are cases, it is true, which hold in effect that, if false representations have been made, the grossest negligence and stupidity in determining the true facts of the case on behalf of the party seeking to avoid the instrument will not bar him from claiming fraud. We are of the opinion, however, that this extends the rule entirely too far. If a party in full possession of his mental faculties, able to read and understand an instrument, and dealing at arm's length with the other party, who admits that he did not take the trouble to read or examine it when presented to him for his signature, is permitted to set it aside on his oral testimony that false representations were made to him at the time by the other party, the parol evidence rule by centuries of experience might just as well be entirely discarded and written contracts of any nature are worthless. We cannot believe that

such is the law, and we therefore hold that, when no reasonable excuse is offered or appears for the failure to read a document, except that the other party stated it to be what it was not, the party executing it will not be permitted to avoid it on the ground of fraud. As was said in the case of *Standard Mfg. Co.* v. *Slot*, 121 Wis. 14, 98 N. W. 923, 105 Am. St. Rep. 1016:

''The fact that a false representation is made in respect to the paper is not necessarily sufficient to excuse such person for affixing his signature thereto. in ignorance of its contents, unless under all the circumstances, in view of his duty to give reasonable attention to the protection of his own interests, the false representation was still reasonably calculated to and did induce him not to make the investigation which he otherwise would have made. A person cannot sign a paper in ignorance of its contents and thereafter excuse such ignorance by the mere plea that he was busy or that he is habitually neglectful in such circumstances, and throw upon the courts the burden of protecting him from the consequences of his imprudence. The policy of the law is fixed to the effect that he who will not reasonably guard his own interests when he has reasonable opportunity to do so, and there is no circumstance reasonably calculated to deter him from improving such opportunity, must take the consequences. Courts do not exist for the purpose of protecting persons who fail in that regard. Where there is such inattention upon the one side and fraud upon the other, and but for the former feature the latter would not be effective, and loss occurs to the inexcusably negligent one, he is remediless; not because the wrongdoer can plead his own wrongdoing as an excuse for not making reparation, but, first, because the consequences are attributable to inexcusable inattention of the injured party; and second, because the court will not protect those who, with full opportunity to do so, will not protect themselves.''

Another question raised by the record is as to the amount of the recovery permissible, if any. The

policy in question contained two clauses in regard to the amount of indemnity payable for illness, which read as follows:

"Illness Indemnities

"Part H.  Confining Illness One Hundred Dollars Per Month For Life.  The Association will pay, for one day or more, at the rate of One Hundred ($100.00) Dollars per month for disability resulting from disease, the cause of which originates more than thirty days after the date of this Policy, and which confines the Insured continuously within doors and requires regular visits therein by legally qualified physician; provided said disease necessitates total disability and total loss of time.

"Part I.  Non-Confining Illness Fifty Dollars per Month.  The Association will pay, for one day or more, at the rate of Fifty ($50.00) Dollars per month, but not exceeding one month, for disability resulting from disease, the cause of which originates more than thirty days after the date of this policy, and which does not confine the Insured continuously within doors but requires regular medical attention; provided said disease necessitates total disability and total loss of time."

It is the contention of plaintiff that the evidence showed he was entitled to compensation at the rate of $100 a month from the third day of January, 1930, up to the date of the action.  It is the position of defendant that during a great period of this time, if he was entitled to indemnity at all, it came under the clause limiting the compensation to $50 per month. The determination of this question involves the construction of the two following clauses:

"Which confines the Insured continuously within doors and requires regular visits therein by legally qualified physician; provided said disease necessitates total disability and total loss of time," and "which does not confine the Insured continuously within doors but requires regular medical attention; provided said disease necessitates total disability and total loss of time."

Similar clauses to these have frequently been construed by the courts and different results reached. Plaintiff calls our attention to the case of *Mutual Ben. Health & Acc. Assn.* v. *McDonald,* 73 Colo. 308, 215 Pac. 135, which case probably presents in the strongest manner the interpretation most favorable to the insured. Therein the court in substance held that the vital point in the provision construed was the total disability, and that, if as a matter of fact the insured were totally disabled, it could make no difference in the risk whether he were literally confined to the house or departed therefrom repeatedly, provided such departure was for a reasonable purpose under the advice of his physician in an endeavor to restore his health.

The case of *Reeves* v. *Midland Casualty Co.,* 170 Wis. 370, 174 N. W. 475, 959, seems to take a stricter view of the language cited. The court says:

"The indemnity provisions of the policy recognize two degrees of illness: One, when the insured is so ill that he is confined within his house and is therein treated by his physician; the other, when he has so far recovered that he is able to be outside the house and to receive treatment from his physician at places other than the house. The purpose of these provisions is not difficult to understand. . . . It was for the purpose of discouraging the protraction of illness for the purpose of securing the fruits of the insurance contract that the company limited full indemnity to the period of actual confinement within the house. This may not be a desirable contract, but the company had the right to prescribe the period during which it should be liable for indemnity, as well as the amount thereof. . . . "

The policy in question herein also contains two provisions for indemnity. In the one the disease must occasion total disability and total loss of time. The same is true under the other. Under the first, the patient requires regular medical attendance. Under the second, this is also necessary. The only condition

in the two provisions which differs is to the effect that in the first the disability confines the insured continuously within doors, while in the second case it does not. If we are to give to the phrase "continuously within doors" the interpretation placed on it by the Supreme Court of Colorado, there is no purpose for or meaning in the second provision for indemnity. As was said in the case of *Rocci* v. *Massachusetts Acc. Co.,* 226 Mass. 545, 116 N. E. 477:

" . . . There may be said to be three degrees of sickness. The first degree is when the patient is confined to his bed. The second degree is when he is not confined to his bed, but is confined to the house. And the third degree is when he is too sick to work, but is not confined to the house. . . . "

In all three of these degrees the patient is unable to pursue his regular avocation; the difference between the second and the third being that in one case he must remain in the house and in the other case he need not. We think the question of whether or not his departing from the house is under the advice of a physician is immaterial. As was stated in *Reeves* v. *Midland Casualty Co., supra:*

"This may not be a desirable contract, but the company had the right to prescribe the period during which it should be liable for indemnity, as well as the amount thereof. If the contract did not appeal to plaintiff, he was under no obligations to purchase it. The premium rate was no doubt fixed by the character of the liability assumed and, the company having made use of plain and unambiguous words prescribing the period of full liability, the court should not substitute another and different contract for the parties."

There is but one other matter which requires our attention, and that is whether there was a legal consideration for the release. The evidence shows that defendant paid to plaintiff a certain portion of indemnity in advance of the time when it was due, based

upon the estimation of the parties as to how long the disability would continue. A payment of money in advance of the time it is due is sufficient consideration for a contract. *Reed* v. *McGregor et al.*, 62 Minn. 94, 64 N. W. 88. We need not refer to any of the other matters raised on the appeal. The judgment of the superior court of Maricopa county is reversed and the case remanded for a new trial.

ROSS, C. J., and McALISTER, J., concur.