[Civil No. 3931. Filed February 21, 1938.]

[76 Pac. (2d) 745.]

JAMES L. BRADLEY, Petitioner, v. THE INDUSTRIAL COMMISSION OF ARIZONA, L. C. HOLMES, J. NEY MILES, and SAM PROCTOR, as Members of Said The Industrial Commission of Arizona, and W. J. TURBEVILLE, Applicant-Employee, Respondents.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Petitioner.

Mr. Don C. Babbitt, Mr. Howard A. Twitty and Mr. Burt H. Clingan, for Respondents.

LOCKWOOD, J.—W. J. Turbeville, hereinafter called petitioner, made application to The Industrial Commission of Arizona, hereinafter called the commission, for compensation for an injury which he claimed arose out of and in the due course of his employment by James L. Bradley, hereinafter called the employer. The commission made an award in favor of petitioner, and, after rehearing, affirmed such award, and the employer brought the matter before us for review.

There is no dispute as to the employment, the accident, and the injury, but it is contended that the following finding of the commission:

"2. That at said time said employer and said employee were subject to the terms of the Workmen's Compensation Law and to the jurisdiction of this Commission,"

is not sustained by the evidence, for the reason that it appears affirmatively that petitioner had before the accident elected to reject the provisions of the Compensation Law. Section 1430, Revised Code 1928, reads, in part, as follows:

"Provided however, that it shall be optional with employees to accept compensation as provided herein or to reject the provisions hereof and retain the right to sue said employer as provided by law. Such election to reject the terms of this article shall be made by a notice in writing, signed and dated, given by an employee to his employer, in duplicate, in substantially

the following form: 'To (name of employer): You are hereby notified that the undersigned elects to reject the terms, conditions and provisions of the law for the payment of compensation, as provided by the compulsory compensation law of the state of Arizona, and acts amendatory thereto.' Such notice must be filed with the employer prior to injuries sustained by such employee, and thereafter, and within five days, the employer must file with the commission the duplicate of such notice so served by such employee."

■■ The evidence shows conclusively and, indeed, it is not disputed, that petitioner did sign a notice in duplicate of the form set forth in section 1430, *supra,* and that the duplicate was in due time filed with the commission. Petitioner contends, in·substance, however, that he did not know what he was signing when he executed the election to reject and that he, therefore, is not bound thereby. We have held that the commission is not bound by many of the ordinary rules of evidence in determining whether an award should or should not be made. *Blankenship* v. *Industrial Com.,* 34 Ariz. 2, 267 Pac. 203; *Ocean Accident & Guar. Corp.* v. *Industrial Com.,* 34 Ariz. 175, 269 Pac. 77; *Johnson* v. *T. B. Stewart Const. Co.,* 37 Ariz. 250, 293 Pac. 20. On the other hand, when the commission makes an award, it is acting judicially and is, therefore, bound to follow the general principles of law. *Doby* v. *Miami Trust Co.,* 39 Ariz. 228, 5 Pac. (2d) 187; *Edens* v. *L. E. Dixon Const. Co.,* 42 Ariz. 519, 27 Pac. (2d) 1107. We think one of these principles when applied to an attempt to defeat an election to reject the Compensation Law, made as provided in section 1430, *supra,* is that the party electing may not set aside his election on the ground that he did not understand the effect of the written instrument unless he brings himself within the usual rule of law as to the showing necessary to set aside a written con-

tract on the ground that the party did not understand its terms.

It is universally held that, when the parties to a contract have reduced it to writing, one of them may not defeat it by showing by parol evidence that he did not understand what the contract meant, except on the ground of mutual mistake, fraud, or misrepresentation, and the modern doctrine is that the rule, strictly speaking, is one of substantive law rather than of evidence. 22 C. J. 1075, and. cases cited. There is no contention that there was a mutual mistake of fact, and the question is whether petitioner was induced to execute the election by any legal fraud or misrepresentation. In so determining we must, of course, take the evidence as strongly as possible in favor of the finding of the commission which necessarily implies that the waiver was obtained by fraud or misrepresentation, and we therefore consider only the evidence of petitioner himself as to the circumstances under which the election was executed. Shortly before he went to work for Bradley in the occupation in which he was injured, an insurance agent named Vernon came to see him. The material testimony in regard to what happened between the agent and petitioner is stated by the latter as follows:

"Q. Along in February? What is this man's name? A. Vernon.

"Q. What did he tell you? A. Well, he came out and told me he wanted to talk about insurance. I told him, 'Mr. Vernon, you needn't talk to me because I am just making bread.' He said, 'Well, that is all right, J. L. will—

"Q. J. L. what? A. He did not say, just said 'J. L.' I had a right to know he was referring to J. L. Bradley. He said 'Bradley is going to pay this for you and if anything happens the check will come to you and not to J. L. hisself.' I told him it was all right if Mr. Bradley wanted to pay insurance on me he could go ahead and write it.

"Q. He wrote up an application, did he? A. Yes.

"Q. Did he ask you to sign this application? A. Yes.

"Q. What did you sign? A. Well, I don't know. I thought it was an insurance application though.

"Q. How many times did you sign? A. If I signed more than twice, I don't know it.

"Q. Did he hand the sheets to you separately for you to sign? A. No, he laid them on the refrigerator and I signed the one on top and he lifted it up and I signed the other.

"Q. Did you read those papers you signed? A. No sir.

"Q. He told you they were applications for insurance? A. I don't know that he did. Of course, I thought that was what it was.

"Q. He had been asking you questions there, putting them down on the top sheet? A. Yes.

"Q. And then when he got through filling out the application, he said, 'now sign here.' Was that it? A. Yes.

"Q. And you thought you were signing applications for insurance? A. Yes.

"Q. That was the only matter which had been talked between you? A. Yes.

"Q. Did this man, Vernon, talk about compensation insurance with you? A. No sir, he did not mention anything about compensation insurance."

On cross-examination petitioner testified as follows:

"Q. Who was present at the time you signed these papers, Mr. Turberville? A. Nobody but my family.

"Q. And at that time and place there were only two papers signed? A. Not that I remember. If I signed more than twice I don't remember it.

"Q. You would not say you did not sign more than that? A. No sir.

"Q. You may have signed more than that? A. Yes, well, not that I remember of.

"Q. You were the only one who signed papers? A. No. My wife signed.

"Q. Your wife signed? A. Yes.

"Q. When you signed the papers, you were able to read, Mr. Turberville? A. I am capable of reading, but I never read it.

"Q. And your wife who was present at the time and place of signing. She likewise reads, does she not? A. Yes, she reads and writes, but she did not read that.

"Q. How do you know she did not read? A. I saw.

"Q. You saw? A. Yes.

"Q. At that time no one prevented you from reading? A. Not a bit.

"Q. Not a bit, you say? Was Mr. Bradley present? A. No sir.

"Q. He was not present? Was Mr. Vernon, the Agent for the Paul Revere Life Insurance Company present? A. Yes.

"Q. And he did not refuse to let you read these papers? A. No sir.

"Q. And naturally the papers were in your possession when you did sign them? A. I never did pick them up.

"Q. Well, that is before you signed, you could have picked them up? A. Yes.

"Q. You could have read them? A. I guess so.

"Q. And the same is true of your wife, is it not? A. Yes. . . .

"Q. You say that one was under the other piece of paper? A. Yes.

"Q. There was nothing to prevent you from taking it out and looking at it? A. Nothing unless he stopped me.

"Q. He did not attempt to stop you? A. No sir.

"Q. They were there in front of you for your signature? A. Yes.

"Q. And I believe you stated in answer to Mr. Clingan's question that Mr. Vernon did not tell you what these two papers were? A. No, he never told me what they was.

"Q. In other words, he made no representation as to what those papers were? A. After he quit asking questions, he had me to sign.

"Q. He never made any representations as to the matters or kind of papers? A. No, sir."

 Summarizing this evidence, which is all that petitioner said on the vital point, it appears that he was told that Bradley was taking out some form of

insurance to protect petitioner; that the agent asked some of the usual questions in regard to insurance, and filled in the insurance application, and then handed several papers to petitioner to sign, the application being on top; that, after that was signed, it was lifted up and petitioner signed the other papers. It is true petitioner thinks he signed his name only twice, but the written documents on file show that he actually executed the application for insurance and a waiver of compensation and a duplicate thereof, which was later filed with the commission. No statement was made by the agent in regard to what he was signing; there was no attempt to prevent his reading all of the documents, and, after he had signed the application, it was lifted so that he could have read the waiver had he desired. He admitted that both he and his wife, who was present, were able to read and to understand the instrument had they read it. The only thing which can be deduced from his testimony which could by any conceivable theory be considered fraud or misrepresentation was that the agent did not affirmatively tell him he was waiving the benefits of the Compensation Law. There is no contention that there was any fiduciary relation between the insurance agent or Bradley and petitioner which placed either of them under any duty to disclose to the latter the nature of the instruments which he was signing. There is not a scintilla of testimony that either of them ever made any representations as to what they were. They were simply presented to petitioner without comment in such a manner that, had he desired, he might have examined and read them carefully before he signed them, and he failed to do this because he believed that they had something to do with the insurance policy which Bradley took out for him. We think this utterly fails to make the necessary showing of fraud and misrepre-

sentation required to set aside a formally executed written election.

■■ We do not doubt that petitioner believed he was signing a paper which had something to do with insurance, but this belief on his part was not brought about by any wrongful acts on the part of the insurance agent or the employer. When a person bound by a writing has carelessly signed the same without reading it, the mere fact that he believed it to be something else than what it was, *when such belief was not brought about by the misconduct of the other party,* furnishes no ground for the admission of parol evidence that he did not mean to execute it, for courts are not under the duty of relieving parties of the consequences of their own gross negligence. The general rule has been laid down in Arizona in the case of *History Co.* v. *Dougherty,* 3 Ariz. 387, 29 Pac. 649, 651. Therein the court said:

"There remains of the answer simply that appellee made an oral agreement, and that, immediately thereupon, appellant fraudulently substituted a written memorandum expressing an entirely different contract. The application of the epithet 'fraudulent' to a transaction is not a sufficient allegation to a pleading of fraud. It is not unusual that the terms of a contract subsequently reduced to writing should first have been orally agreed upon, and the subsequent written contract is a substitution. There is no allegation in this answer that the substitution was accompanied by any act or characterized by any omission of appellant's agent that would warrant the inference that any imposition upon appellee had been practiced. It does not appear, and we cannot assume, that appellee could not read. His expressed willingness to read of and concerning himself in the book negatives such an assumption. It does not appear that appellant's agent concealed from him the contents of the memorandum, or that he falsely read it to appellee. It seems that, if in fact there had been a substitution of a different agreement for the one appellee alleges he made, it

was due to the utter carelessness and negligence of appellee himself. Negligence on the part of the appellee would not be a ground for withholding relief against fraud, if fraud actually existed; but, as we have said, there is no proper allegation of fraud. Courts will not undertake to protect men against such a total want of caution and care as appears in this case, from appellee's own allegations. There was nothing in the relation of the parties to warrant such childlike confidence in the fidelity and common honesty of appellant's agent as that displayed by appellee. The mere suggestion that the oral contract, which appellee says was complete, be reduced to writing, ought to have prompted appellee to a reasonable degree of care in its execution.''

We have also considered an attempt to avoid the terms of a written instrument in the case of *Smith* v. *Mosbarger,* 18 Ariz. 19, 156 Pac. 79, 80, and have pointed out that the manner in which a written contract may be impeached is as follows:

''For instance, where fraud or imposition has been practiced upon one of the parties, or where the contract was executed under a mistake of fact. Written contracts are always presumed to be fair and honest in their inception and execution, and the party challenging a written contract for fraud or mistake of fact must sustain his position by clear and convincing evidence. Likewise when fraud or mistake is alleged as a ground for avoiding the stipulations of a contract, it must be made to appear, not that the party has made a bad bargain, but that he has been wrongfully and fraudulently induced to execute something contrary to what he thought to be his contract. Courts cannot and will not rectify bad bargains or make contracts for parties and, in order to avoid the appearance of doing so, strong and cogent reasons are demanded, not only in the pleading, but in the evidence in support thereof, when an attack is made on a written contract for either fraud or mistake of fact.''

In the case cited, the party attempting to avoid the written instrument alleged that he was not well versed

in the English language, was unable to read and understand the contract, and was in feeble and ill health, and that the other party misrepresented to him its nature. We stated that under such circumstances a contract might be avoided for fraud, but the whole case shows clearly that fraudulent representations on the one hand and the inability of the other party to properly understand the contract, even had he made the effort to read it, on the other, was the basis for the court's holding.

The present case is clearly one where the party executing the election of rejection failed to exercise the most elementary precautions in ascertaining the nature of the instrument which he was signing, when he was perfectly able to read and understand it, and was not prevented from doing so by any statement or act of the other party.

The finding of the commission that the employer and employee were subject to the terms of the Workmen's Compensation Law and the jurisdiction of the commission at the time of the accident was not sustained by the evidence, and the award is set aside.

McALISTER, C. J., and ROSS, J., concur.