245 P.2d 1025

**LANE et ux. v. MATHEWS.**
No. 5488.

Supreme Court of Arizona.
July 17, 1952.

Nasib Karam, of Nogales, for appellants.

Norman Herring, of Tucson, for appellee.

STANFORD, Justice.

The original opinion in this case was handed down on March 31, 1952 and reported in 73 Ariz. 435, 242 P.2d 557. Appellee timely filed a motion for rehearing which raised doubt as to the correctness of the original decision. After consideration of appellee's motion, the motion for rehearing was granted thereby nullifying the original opinion. In order to better understand the principles involved in this case, we again relate some of the necessary facts.

This action arose out of the alleged breach of the conditions and undertakings of a farm lease. E. C. Lane and Millie Lane, appellants and defendants below, hereinafter styled lessors, own a farm near McNeal, Arizona. Sometime during the month of February, 1948, Bob Mathews, appellee and plaintiff below, hereinafter styled lessee, entered into negotiations with lessors to lease the farm on a percentage basis of the crop grown. The terms to be later incorporated in a written lease were discussed by the parties at the farm in the presence of J. M. Jessen, lessors' attorney, who resides and practices law in California. Jessen made a written memorandum of the terms agreed upon and on his return to California drew up a lease and mailed three copies to lessors, two of which were to be signed by the respective parties. Lessors read the lease and then, without signing it, delivered the lease to lessee for his signature. Lessee, who can neither read nor write, had the agreement read to him. Not being satisfied with the terms thereof, lessee took the agreement to Alfred Putts, his financial backer, for inspection. Putts and lessee took the lease to Lloyd Helm, a Douglas attorney, and had the last page changed to embody the terms and conditions which they contend had been agreed upon by the parties. Helm's secretary removed the original last page, number seven, and substituted the new page seven embodying the changes. The secretary also copied the secreterial marks on the new page as they appeared on the original six pages of the lease, i. e., JMJ:MSJ and the date 3/16/48, which was also on the original seven pages. Lessee then signed the lease and returned it to lessors *without mentioning the changes which had been made on the last page.* Lessor E. C. Lane testified that he did not reread the lease before signing it but stated that he checked the pages noting the identifying marks on the bottom of each page. After so inspecting the lease, lessors signed it before a notary public in their attorney's office in California.

Lessee brought this action for damages to the cotton crop as a result of lessors'

refusal to keep the water pumps and engines in good repair, as they were required to do under the terms of the signed written lease. Due to lack of irrigation, approximately 200 acres of cotton were damaged. Lessors answered and counterclaimed, praying for reformation of the agreement to exclude the provisions in the written lease which were added by lessee on the last page and for damages to their farm machinery. Their defense was fraud or mutual mistake. The trial was before a jury in two phases, the first, on the issues of fraud or mutual mistake, and the second on the question of the breach of the lease. At the close of the first phase of the trial the court instructed the jury to return a verdict in favor of lessee on the issue of mutual mistake and submitted the following interrogatories on the issue of fraud:

"Did E. C. Lane and Millie Lane know that the last page of the farm lease had been changed before they signed it?"

Answer—"No."

"If your answer to the above interrogatory numbered one (1) is no, then: did E. C. Lane and Millie Lane act as reasonably prudent persons in failing to read the last page of the Farm Lease?"

Answer—"Yes."

"Under the instructions of the court, did E. C. Lane and Millie Lane sign and execute the farm lease as the result of fraud on the part of Bob Mathews?"

Answer—"No."

At this point in the trial the lessors moved for judgment on the answers to the interrogatories, claiming the answers established mistake on their part and fraud or inequitable conduct on the part of the lessee. The court denied the motion and ordered the trial to proceed on the question of the breach of the signed agreement. The jury rendered a verdict in favor of lessee in the sum of $11,500 and further found in favor of lessee and against lessors on lessors' counterclaim. Lessors now prosecute this appeal.

Lessors present several assignments of error, the first two of which deal with the court's action in instructing the jury to return a verdict in favor of lessee on the issue of mutual mistake. Although lessee's testimony is somewhat contradictory on the question of his knowledge of the changes in the lease, we believe the lower court correctly decided that reasonable men could not differ in the conclusion that lessee well knew the lease had been changed to embody the terms which he contends had originally been agreed upon by the parties. We therefore find no merit in the first two assignments of error.

Lessors' third assignment of error sets forth six interrogatories to the jury which lessors contend the court erred in refusing to submit. Four of the request-

ed interrogatories deal with mutual mistake and therefore need not be discussed in the light of our decision on that issue. The other two interrogatories, however, raise issues necessary for our determination. Briefly stated, the remaining two requested interrogatories raise the issue of whether the written agreement, as signed by the parties, is in fact the true agreement which the parties had originally intended. Lessors rely on the case of Haynie v. Taylor, 69 Ariz. 339, 213 P.2d 684, 689, in which the court said:

"* * * we hold that in the trial of equity cases where a jury has been demanded, the court may not withdraw the determination of controverted facts from the jury and that the case may only be withdrawn from their consideration where there is no controverted issue of fact, in other words, only in cases where if it were an action at law the court would be required to direct an instructed verdict."

We do not believe the court withdrew any controverted issues of fact from the jury. The issue for determination under the pleadings was whether lessors had established grounds for reformation of the written agreement. That issue was submitted to the jury on proper interrogatories. Admittedly the answers to the interrogatories submitted were not altogether consistent. However the court was not bound by these answers and proceeded to find and adjudge that the agreement as signed by the parties under all the evidence should be enforced. It will be further noted that the Haynie case, supra, was a case in which the lower court completely withdrew all controverted issues of fact from the jury. In the instant case the lower court submitted all necessary questions of fact to the jury and we therefore hold the assignment is without merit.

Lessors' fourth assignment of error contends that the court erred in denying their motion for judgment on the answers to the interrogatories for the reasons that the answers established mistake on their part, a mistake which reasonably prudent persons would make; that they were not negligent in failing to reread the lease before signing it; and inequitable conduct on the part of lessee in not notifying lessors of the changes which had been made. It must be remembered that in equity cases the jury's verdict is advisory only and may be disregarded by the court. Holman v. Roberts, 35 Ariz. 110, 274 P. 775. The court in effect found, when it ordered the trial to proceed on the question of the breach of the written agreement, either that (1) lessors were inexcusably negligent in failing to reread the lease before signing it; (2) that there was no inequitable conduct on the part of the lessee in not advising lessors of the changes, or (3) that there was negligence on the part of lessors and inequitable conduct on the part of lessee; but applying

the rule as enunciated in In re McDonnell's Estate, 65 Ariz. 248, 179 P.2d 238, that where there is a clear showing of fraud on the one hand and gross negligence upon the other, and the rights of third parties are not involved, the negligence and not the fraud will be punished. Or the court could have found that the true agreement was the agreement as signed by the parties. It is elementary that if there is any reasonable evidence to support the judgment of the lower court it must be affirmed on appeal. Kenton v. Wood, 56 Ariz. 325, 107 P.2d 380. We do not know the exact theory upon which the lower court based its judgment; therefore we shall examine the several possible theories advanced. Lessee strongly urges that lessors were grossly negligent in failing to reread the lease before signing it. Lessee stresses lessors' ages, experience in business affairs and the fact that they were represented by competent counsel. Lessee also points out that the paper and the typing on the substituted page seven were of somewhat different quality and type and that the lease and copies were in the possession of lessors and their attorney for several days before lessors signed them. We are of the opinion that there is reasonable evidence upon which the lower court could have found lessors grossly negligent. In determining the sufficiency of evidence to support the judgment, the supreme court will not consider the fact that it would have reached a different conclusion, but only whether the judgment is reasonably supported by any substantial evidence. Rouillier v. A. & B. Schuster Co., 18 Ariz. 175, 157 P. 976. In reviewing the issue of lessee's alleged inequitable conduct, it must be remembered that the parties were dealing at arm's length in negotiating the terms of the lease. We do not know whether the lower court found lessee to be guilty of inequitable conduct or not. In any event, the rule in this jurisdiction is as laid down in the McDonnell case, supra, and the earlier cases of Bradley v. Industrial Commission, 51 Ariz. 291, 76 P.2d 745; and Mutual Benefit H. & A. Ass'n v. Ferrell, 42 Ariz. 477, 27 P.2d 519, to the effect that when the rights of third parties are not involved, the negligence and not the fraud will be punished.

█ Lessors' fifth assignment of error contends the court erred in refusing to grant a mistrial by reason of the misconduct of the jury in securing a dictionary from the bailiff to ascertain the meaning of words contained in the instructions given by the court and the interrogatories submitted to them. It suffices to say in disposing of this assignment that although the jury's conduct is not in any way to be sanctioned by this court, it does not appear that lessors were prejudiced by such conduct. The misconduct of the jury was at the most harmless error. Webb v. Hardin, 53 Ariz. 310, 89 P.2d 30.

█ The sixth assignment of error contends the court erred in denying a motion for a mistrial because of miscon-

duct on the part of one of lessee's attorneys in singling out a juror by name and addressing a remark to him individually in his summation of the case. Again we wish to emphasize that such practice is not in favor with this court but in this particular instance the lower court sustained lessors' objection to the remarks in the presence of the jury. We feel that the lower court did not abuse its discretion when it refused to grant a mistrial. Such matters are discretionary with the trial court and if it did not feel the particular remarks in this case were of such nature as to unduly prejudice the jury, its ruling will not be disturbed without a clear showing of prejudicial error. Connor v. Timothy, 43 Ariz. 517, 33 P.2d 293.

The remaining assignments of error deal principally with the issue of damages. Lessors contend the damages assessed by the jury are speculative, contrary to the evidence and excessive. The jury returned a verdict in favor of lessee in the amount of $11,500, which lessors contend was given under the influence of passion and prejudice. The measure of damages for the loss of a growing crop is correctly stated in Beville v. Allen, 28 Ariz. 397, 237 P. 184, 185, from which we quote:

"* * * The measure of damages for the first class is ordinarily given as the value of the crop at the time and place of destruction. 17 C.J. 887. But when the destruction is a gradual one, such as was caused in this case by the deprivation of irrigation water, *we think the true rule is the difference between the value of the probable crop at maturity and its actual value at that time, less the expense of preparing it for use or market.* (Citing cases.)" (Italics ours.)

The court instructed the jury on the measure of damages as follows:

"In this connection, you are instructed that the measure of damages for the loss of a growing crop is the difference between the value of the crop actually grown and marketed and what the crop would reasonably have been had the cause of damage to it not occurred, less the amount necessary to produce, harvest and market such additional production."

Thus it is seen that the court correctly instructed the jury on the measure of damages applicable in this case. Lessors contend lessee did not establish the cost of harvesting, transporting and marketing, thereby defeating the claim for damages. Lessee on the other hand contends that at the time of lessors' breach in not maintaining the pumping equipment, all the necessary preparation and farming had been done except the irrigation and final expenses of picking, hauling and ginning, which lessee claims were established by testimony given at the trial. A study of the testimony leads us to believe that there was sufficient evidence from which the

jury could render their verdict and assess damages in the sum of $11,500; therefore, for the reasons advanced in this opinion, the judgment is affirmed.

Judgment affirmed.

UDALL, C. J., and PHELPS, J., concurring.

LA PRADE, Justice (dissenting).

I cannot agree with the disposition made of this case on rehearing, and am firmly convinced that the case was correctly determined on the first decision.

The evidence discloses that the parties had presumably come to an agreement at the time of their oral discussions. The lessor attempted to reduce the purported agreement to writing and submitted it to lessee in the form of a written lease. The lessee kept the written agreement for some time, more than a few days. Finally the lessor came from California and visited the premises, and while there asked the lessee if he had executed the lease. The lessee responded in the affirmative, whereupon the lessor asked where the documents were. At this time the lessee pointed toward a car seat or truck, where the lessor picked them up. The lessee did not disclose the fact that material changes in the terms of the written lease had been made. With reference to this situation the majority opinion reads as follows:

"Lessee, who can neither read nor write, had the agreement read to him. Not being satisfied with the terms thereof, lessee took the agreement to Alfred Putts, his financial backer, for inspection. Putts and lessee took the lease to Lloyd Helm, a Douglas attorney, and had the last page changed to embody the terms and conditions which they contend had been agreed upon by the parties. Helm's secretary removed the original last page, number seven, and substituted the new page seven embodying the changes. The secretary also copied the secretarial marks on the new page as they appeared on the orignal six pages of the lease, i. e., JMJ:-MSJ and the date 3/16/48, which was also on the original seven pages. Lessee then signed the lease and returned it to lessors *without mentioning the changes which had been made on the last page.* Lessor E. C. Lane testified that he did not reread the lease before signing it but stated that he checked the pages noting the identifying marks on the bottom of each page. After so inspecting the lease, lessors signed it before a notary public in their attorney's office in California."

I cannot agree with this statement of the facts. The lessee testified that upon receipt of the lease he did not read it or have it read but took it to his financial advisor, Mr. Putts. It was Mr. Putts who changed the lease and the terms thereof. He did this without the knowledge or consent of the lessee. After the changes were made the lessee testified that the lease was read to

him, that it sounded all right and that as far as he knew it conformed with what he believed the terms to have been at the time of the oral agreement.

The court refused to submit to the jury the following interrogatories:

"Number 4. Were the plaintiff and defendants mutually mistaken as to the execution of the agreement?"

"Number 6. Does the agreement as signed impose upon the defendants obligations which were not intended or agreed that the defendants should assume or bear?"

"Number 7. Does the agreement as signed embody the true agreement between the plaintiff and the defendants?"

"Number 11. Did the plaintiff at the time that he returned to the defendant, E. C. Lane, the agreement, know of the changes made with respect to page 7?"

"Number 13. Did the plaintiff and the defendants sign the agreement under the mutual mistake that the agreement as signed was the same document which was presented by the defendants to the plaintiff for his signature?"

"Number 15. Was page 7 of the agreement substituted by A. H. Putts or any other person acting in concert with him without the authority or knowledge of the defendants and the plaintiff?"

The lessee testified that the lease submitted did not contain the terms that had been agreed upon although at the time he executed the lease he was unaware that the submitted lease did not contain the terms he had agreed upon.

There was very definitely a conflict in the evidence and a controverted issue of fact. By refusing to give the submitted interrogatories the court deprived itself of the advice of the jury with respect to what the true agreement was. The law in this situation in this jurisdiction is as follows:

"* * * we hold that in the trial of equity cases where a jury has been demanded, the court may not withdraw the determination of controverted facts from the jury and that the case may only be withdrawn from their consideration where there is no controverted issue of fact, in other words, only in cases where if it were an action at law the court would be required to direct an instructed verdict." Haynie v. Taylor, 69 Ariz. 339, 213 P.2d 684, 689.

The defendants (lessors) were entitled to have these interrogatories answered for the advice of the court. It is no answer to say that the court would not have been bound by the answers, which is true, but the court was bound to receive the advice upon the material issue of fact in this case, namely, what was the true agreement between the parties?

DE CONCINI, Justice (dissenting).

I agree with Judge LA PRADE's dissent on the point that the defendants are entitled to the right to have the jury decide

what was the true agreement between the parties.

I am mindful of the rules laid down in Bradley v. Industrial Commission, supra, and Mutual Benefit Ass'n v. Ferrell, supra, that a person cannot avoid his written contracts by failing to read them before he signs. I do not agree with the statement in the case of In re McDonnell's Estate, supra, that says as between a negligent person and one guilty of fraud, the negligent person shall suffer and the fraudulent person go free.

In the instant case, the majority goes one step further than the McDonnell case and compounds error so to speak. In the Mc-Donnell case, the quitclaim deed was presented and signed by the grantor without reading it, based on false representations of one of the grantees. In this case Lane, one of the defendants, had the lease prepared and *had read it before it was delivered to Mathews, lessee.* It contained what he contended was the true agreement between the parties. Mathews then had it read and reread to him and, together with Mr. Putts his financial backer they concluded it did not provide as the parties agreed. They undertook to change its terms by having a page rewritten with the same date and with the same dictator's and stenographer's initials placed thereon as were on the original lease, and then delivered the same to Lane without advising him of the change.

Such action strikes me as inequitable conduct on the part of Mathews. The majority opinion extends the rule in the McDonnell case to the extent that the burden was not only on Lane to *read* the lease, but also to *reread* the lease after it was returned to him in what was purportedly the same condition (but actually it had been changed) as the original lease. Such inequitable conduct should not be condoned by a court of law. The judgment should be reversed, a new trial granted, with instructions to the trial court to ascertain what was the real agreement between the parties. Was it as the original lease provided, as Lane contends, or as provided by the rewritten lease, as Mathews contends?

For the foregoing reasons, I dissent.