413 P.2d 291

John L. APOLITO and Alice M. Apolito, husband and wife, and Howard E. Drensek and Dolores A. Drensek, husband and wife, Appellants,

v.

Florence JOHNSON and Lee Johnson, wife and husband, Appellees.*

No. 1 CA–CIV 288.

Court of Appeals of Arizona.

April 14, 1966.

Modified on Denial of Rehearing
May 26, 1966.

See 3 Ariz.App. 358, 414 P.2d 442.

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 7496. The matter was referred to this court pursuant to A.R.S. § 12–120.23.

Stockton & Hing, by Henderson Stockton, Phoenix, for appellants.

Moore & Moore, by Robert C. Moore, Phoenix, for appellees.

HATHAWAY, Judge.

This is an appeal from a Maricopa county superior court judgment entered in favor of Mr. and Mrs. Johnson, defendants below,

and from the order denying plaintiffs' motion for a new trial. The lower court granted defendants' motion for a directed verdict at the close of all the evidence and plaintiffs assign as error the trial court's withdrawal of the case from the jury's consideration.

The defendants' motion for a directed verdict admitted the truth of plaintiffs' evidence, including all reasonable inferences deducible therefrom, Joseph. v. Tibsherany, 88 Ariz 205, 354 P.2d 254, 257 (1960), and required that the evidence be viewed in a light most favorable to plaintiffs' case. Davis v. Weber, 93 Ariz. 312, 314, 380 P.2d 608 (1963). Viewing the evidence in this manner, the following pertinent facts are revealed.

In the fall of 1957 the plaintiffs, Mr. and Mrs. Drensek and Mr. and Mrs. Apolito, entered into negotiations with Mrs. Johnson to purchase an interest in 35 acres of land situated in Tempe, Arizona, and owned by the Johnsons. Mrs. Johnson told them that she had been offered $2,000 an acre for the land but she preferred to retain the property for tax purposes. She was willing, however, to let each couple buy an undivided quarter interest. Each couple was to make a down payment of $3,500, making the total down payment $7,000 on a purchase price of $26,250. There were to be no further payments as the remainder of the purchase price was to be paid from the proceeds of the sale of the land when it was eventually sold. Mrs. Johnson negotiated separately with each couple as the Drenseks, and the Apolitos at the time of this transaction were not on friendly terms.

Mrs. Johnson delivered the escrow instructions to the plaintiffs for execution by them. These instructions set forth the total purchase price as $52,500, a down payment of $7,000 and semiannual payments of $2,000 on the remaining balance. Mrs. Drensek testified as follows:

"Q. At that time was there any discussion about the escrow instructions?

"A. Well, I asked how come it was so much money, the $52,000, and I ask-

ed her if that was for the whole fifty acres and she said no, that is for thirty-five acres.

And I said how come so much money? And she said she has to fix a value on the property for the purpose of her guardians of the trust fund, but not to worry about these figures.

Then I noticed or saw some place in here about this payment, and I said 'Well, what is this payment business?' I said, 'We don't have any more money.' And she said, 'Don't worry about it. That is something that has to be marked in there for the escrow people.' "

Mr. Drensek testified concerning this discussion:

"A. There wasn't really too much conversation about this, as I remember, except that Mrs. Johnson said for the benefit of the title company or someone that we had to initial this paper.

"Q. Was there any conversation about purchase price at this time?

"A. Just what my wife questioned her about, yes.

"Q. What was that?

"A. She questioned the price on it, and once again Mrs. Johnson reassured us that we were not to pay any attention to that price, that this deal was exactly the same as the one we entered into on the two and a half acres, that this was just for the benefit of her trust officers, and that she had to show the title company something and that was the reason for it.

"Q. Were the escrow instructions signed by you folks on this occasion?

"A. Yes."

Mr. Apolito testified about the escrow instructions:

"Q. Was there any conversation there at your home in regard to the papers?

"A. Well, not too much. We, we did mention the fact about the price of $52,500, payments, but as I said before, we had complete confidence.

"Q. What did she say, what did Mrs. Johnson say?

"A. She said, 'That don't mean nothing. It is the same as the other contract.'

"Q. That is the two and half acres?

"A. We wouldn't have to make no payments, not to worry about it."

A few days after signing the escrow instructions, the plaintiffs, each couple separately, went to the title company and signed the realty purchase contract. They claimed that they didn't bother to fully examine the contents and provisions of the contract since it seemed to correspond with what had appeared in the escrow instructions. In substance, Mr. and Mrs. Drensek and also Mr. Apolito admitted that they merely glanced at the document and signed it without question as they relied on Mrs. Johnson. The contract provided for the conveyance by the Johnsons of a half interest in the 35 acre parcel, an undivided quarter interest to the Drenseks and an undivided quarter interest to the Apolitos, for the sum of $52,500, payable $7,000 down and the balance of $45,500 payable in semiannual installments of $2,000 each. Its terms and provisions were in accordance with the escrow instructions executed by the parties.

In the summer of 1958, Mr. Drensek showed a copy of the contract to a third person and as a result of their conversation Mr. Drensek contacted Mrs. Johnson. He stated at the trial:

"I presented the information that I had gotten from this third party, the way the contract read, and as soon as I presented that she just stormed right up in the air and started hollering and calling names of this third party, and asked if we didn't trust her, that this deal is exactly the same

as the other one was,[1] that if we don't trust her, why don't we just come out and say so?"

The plaintiffs became concerned and sought legal advice. Acting on the advice of counsel, plaintiffs wired to defendants a notice of rescission of the contract on the ground of misrepresentations and offered to execute a quit-claim deed upon return of the moneys received by the defendants. The defendants responded by telegram giving notice of their election to declare a forfeiture of plaintiffs' interest which was followed by a formal notice from the title company to the effect that the sellers would enforce the forfeiture provisions unless all delinquent payments were made within 30 days from the date of mailing the notice.

It should be pointed out that the parties were not strangers to each other. The plaintiffs, who had known each other for several years, became acquainted with the defendants during the summer of 1957. Mr. Drensek and Mr. Apolito were employed to sell stock in a corporation of which Mr. and Mrs. Johnson were officers. Mrs. Johnson had visited the plaintiffs' homes on numerous occasions for the purpose of picking up or delivering business materials and reports. Although these visits were prompted by business reasons, they also had aspects of "socializing."

Mrs. Johnson's version of the transaction differs considerably from plaintiffs'. She testified that Mr. Drensek and Mr. Apolito approached her about purchasing an interest in the 35 acres and that they agreed upon a price of $3,000 an acre and denied having made any statements with regard to another offer of $2,000 an acre. The plaintiffs asked her to prepare an offer to purchase as she had the forms and was more knowledgeable in preparation of such papers. She testified as follows concerning the discussion with the Drenseks:

"Q. Was there any discussion or any comment about the terms of the contract, there, the amount? ·

"A. Yes, sir.

"Q. Who made a comment about that?

"A. Mrs. Drensek.

"Q. What was it?

"A. Well, on the offer to purchase this property, it stated the sum of $52,-500. And Mrs. Drensek said to me, she said 'Well, now, Mrs. Johnson' —not Mrs. Johnson, 'Florence,' she said, 'How come that it says $52,-500?'

She said, 'Now, is Howard and I supposed to pay $52,500? And Johnny and Alice supposed to pay $52,500?'

And I said, 'No, you are not to pay $52,500. You are to share the obligation between you, half of that $52,500 would be Mr. Apolito's and his wife, and the other half would be yours.'

\*       \*       \*       ·\*       \*       \*

So they brought up the matter of the money to be paid off and we had discussed that before, because Mr. Drensek had said to me now, he said 'There is only one thing I'd like to know,' he said, 'If you people would be good enough to do for us, to make those down payments as low as possible to be sure that we can make them.'

\*       \*       \*       \*       \*       \*

And when Mrs. Drensek saw the $2,000, she said, 'Well now, does this mean $2,000 apiece too?' And I said no. 'On the first payment you and Mr. Drensek shall have to see to half of it, the same as half of the $52,500. The obligation of half of that remains the Apolitos' as well as

1. The other deal to which the parties refer was a prior realty transaction between the same parties involving two and a half acres of land, which purportedly required only payment of a certain sum

down and no further payments. The deal was never consummated as the parties agreed to switch to this new transaction.

the payments to be halved as well, not just the buying price.' And they were perfectly content about it."

Mrs. Johnson further testified that shortly after execution of the purchase contract, Mr. Apolito received a payment book from the title company which showed when the semiannual payments were due. They discussed the matter because Mr. Apolito was concerned about the fact that the book merely had the Apolitos' name endorsed on it and he didn't want to be responsible for the Drenseks' half of the obligations. The record reveals that both the Drenseks and the Apolitos were preparing to make the first semiannual payment.

■ Assuming the jury believed plaintiffs' version, would the lower court have been justified in setting aside a verdict in their favor? This is the question we must answer to determine whether the trial court erred in directing a verdict for the defendants. Costello v. Wood, 89 Ariz. 270, 271, 361 P.2d 10 (1961).

■ In order to establish a prima facie case, that is, one sufficient to go to the jury, it was incumbent upon plaintiffs to establish by sufficient competent evidence the nine elements of fraud[2] as adopted by our Supreme Court in the case of Moore v. Meyers, 31 Ariz. 347, 253 P. 626 (1927). Proof of the required elements must be sufficient to overcome the initial presumption in favor of honesty. In Re McDonnell's Estate, 65 Ariz. 248, 253, 179 P.2d 238 (1947).

■ Defendants' position is that the plaintiffs knew exactly what they were doing, knew the terms of the contract and having signed it should not be heard to complain that the contract did not say what they thought it should say. It is well settled in this jurisdiction that a person's negligence

in failing to read a document which he was requested to sign and which he had never seen before precludes recovery on the basis of fraud, there being no right to rely on the representations concerning the document. Smith v. Mosbarger, 18 Ariz. 19, 156 P. 79 (1916); Mutual Benefit H. & A. Assn. v. Ferrell, 42 Ariz. 477, 27 P.2d 519 (1933); Bradley v. Industrial Comm., 51 Ariz. 291, 79 P.2d 745 (1938). Here the plaintiffs in fact knew that the contract specified a total purchase price of $52,500 and that semiannual payments of $2,000 would be due on the balance remaining on the contract price.

■■ We are dealing here with a written contract, clear and certain in its terms, and a claim of fraud-inducing execution. There was no basis for a claim of fraud, as at least one essential element was lacking, i.e., a representation as to a past or presently-existing *fact*. Mrs. Johnson's statements were not representations of fact but amounted to nothing more than representations by one layman to another as to the meaning or legal effect of the terms of a written agreement. A misrepresentation of law or of the legal effect of a contract does not constitute actionable fraud so as to vitiate the contract. 17 C.J.S. Contracts § 158 and cases cited therein; Agnew v. Foell, 113 Cal.App.2d 575, 248 P.2d 758, 760 (1952); Ackerman v. Bramwell Inv. Co., 80 Utah 52, 12 P.2d 623, 627 (1932).

■ Furthermore, the representations attributed to Mrs. Johnson were contradictory to the provisions of the written agreement, hence violative of the parol evidence rule and not admissible at all. Newmark v. H. & H. Products Mfg. Co., 128 Cal.App.2d 35, 274 P.2d 702, 703 (1954); Shyvers v. Mitchell, 133 Cal.App.2d 569, 284 P.2d 826, 830 (1955); Bank of America National Trust & Saving Ass'n v. Lamb Finance Co., 145 Cal.App.2d 702, 303 P.2d 86, 95 (1956).

2. (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) his consequent and proximate injury.

Plaintiffs contend that notwithstanding Mrs. Johnson's representations may be statements of either opinion or as to the law, a confidential relationship existed between the parties, thereby rendering such representations a proper basis for rescission. We find no merit in this contention. A confidential relation, violation of which may form a basis for a claim of fraud, is a relation in which one party is bound to act for the benefit of the other and can take no advantage to himself from his acts relating to the interest of the other. Mere confidence or faith in another's honesty, as repeatedly expressed by the plaintiffs, is not sufficient to create a confidential relationship. In Re McDonnell's Estate, supra.

Mrs. Johnson's conduct, if the plaintiffs' testimony is accepted as true, may seem lacking in "fair play," but it does not infect the transaction with fraud. The plaintiffs, though perhaps lacking in business acumen, were neither illiterate nor incompetent. They in fact asked several questions about the material terms before signing any binding agreement. The contract they executed spelled out the terms of the sale and they are bound thereby Where the parties were competent to contract and did so freely at arms length, it is not the province of this court to act as a post transaction guardian for either party. See Short v. Martin, 255 Iowa 189, 121 N.W.2d 154, 157 (1963). As stated by our Supreme Court in Smith v. Mosbarger, supra:

"We may state it as a general rule, when parties competent to contract have come together and reduced to writing the terms and conditions of their agreement, the law protects and guards with great caution the written memorial of their contract thus made." 18 Ariz. at 23, 156 P. at 80.

Since lack of proof of an essential element, i. e., a representation, is fatal to a case based on fraud, Han v. Horwitz, 2 Ariz.App. 245, 407 P.2d 786 (1965), a verdict on such issue would not stand. Therefore we agree with the trial court's ruling on defendants' motion for a directed verdict. The court is justified in directing a verdict where the evidence is insufficient to support a contrary verdict. Higgins v. Kittleson, 1 Ariz.App. 244, 246, 401 P.2d 412 (1965); Costello v. Wood, supra.

Judgment affirmed.

KRUCKER, C. J., and MOLLOY, J., concur.

NOTE: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12-120 subsec. E.