James H. SHULTZ, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 2–980 A 301.

Court of Appeals of Indiana,
Second District.

March 16, 1981.

Opinion on Rehearing Denied
June 2, 1981.
See 421 N.E.2d 22.

Charles H. Criss, Fern & Criss, Peru, for appellant.

Linley E. Pearson, Atty. Gen., Carmen L. Quintana, Deputy Atty. Gen., Indianapolis, for appellee.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Defendant James H. Shultz (Shultz) appeals convictions of Driving While Intoxicated (I.C. 9–4–1–54(b)) and Driving Left of Center (I.C. 9–4–1–63) entered against him following a jury trial, claiming a dictionary should not have been sent into the jury and error in admission of testimony as to blood taken by hospital employees.

We affirm.

## FACTS

The facts most favorable to the verdict are as follows:

On the night of October 18, 1979, Shultz collided head-on with a vehicle driven by Lawrence Williamson (Williamson). The accident occurred on Business Route 31, a two-lane highway in Miami County. Williamson testified that immediately after crossing a bridge, he observed Shultz's car strike the curb and cross the center line into his lane. Williamson testified that he had time to stop his car and attempt to back out of Shultz's path, all the time flashing his bright lights and honking his horn. Despite his efforts, Shultz collided with him. Williamson sustained injuries in the wreck.

Shultz was also injured. Witnesses testified that Shultz had a bloody nose and mouth, and that he appeared to be both dazed and intoxicated. Shultz, Williamson, and Williamson's passenger were transported to the hospital in the same ambulance. Upon arrival at the hospital, Williamson testified that he, his passenger, and Shultz were placed in the emergency room in a manner that enabled him to hear Shultz's conversation. At one point, Shultz said to a medical technician, "Man I have had one too many." (R. at 98).

A blood sample was drawn from Shultz while he was undergoing treatment. The alcohol content of the sample was .20 per cent. (R. at 180). When he was released, Shultz's nose and mouth were bandaged.

During jury deliberations, the jury asked the bailiff if they could have a dictionary. The bailiff communicated that request to the judge, who replied by having the bailiff take them a dictionary.

The jury found Shultz guilty of both Driving While Intoxicated and Driving Left of Center. He was sentenced to the Indiana State Farm for one year, fined two dollars and costs, and his driver's license was suspended for two years. Shultz posted appeal bond and perfected this appeal.

## ISSUES

1. Did the court err in responding to a request of the jury without consulting counsel or calling the jury into open court?

2. Did the court commit reversible error by providing a dictionary to the jury during their deliberation, at their request, without first consulting with counsel for both sides?

3. Does the physician-patient privilege prohibit the trial court from admitting testimony of a hospital employee regarding the results of her analysis of Shultz's blood sample when the sample was initially requested by a doctor and the doctor did not testify?

4. Did the trial court err in admitting evidence as to the blood alcohol content of Shultz when the technician who analyzed the blood and testified regarding it was not certified by the Indiana State Department of Toxicology?

5. Were Shultz's constitutional rights against self-incrimination and unlawful search and seizure violated by the admission of testimony regarding a blood sample drawn, while Shultz was conscious, without his consent?

## DECISION

*ISSUE ONE*—Did the court err in responding to a request of the jury without consulting counsel or calling the jury into open court?

*CONCLUSION*—The court did not err in responding to the jury's request.

The discussion of this issue is limited to consideration of the question of the propriety of the alleged "communication" itself; the question as to whether allowing the jury access to a dictionary is error will be dealt with as Issue Two, *infra.*

The record in this case presents the issue of communication between judge, bailiff, and jury to us in the following affidavit:

## AFFIDAVIT

I, J. Ward Vandegrift, Special Judge of this cause, State of Indiana vs James Shultz, hereby swear that while the jury was in the Jury Room, during deliberations, they requested through the Bailiff, the use of a dictionary. I granted the request. The dictionary was a Webster's New World Dictionary of the American Language/Second College Edition. The Bailiff delivered the dictionary to the jury in the Jury Room. Neither counsel for the State, nor counsel for Defendant, nor Defendant were present at that time. Also neither counsel for State, counsel for Defendant, or Defendant was consulted about the dictionary. Counsel for Defendant, Charles H. Criss, objected to the procedure as soon as he learned it had

been followed and his objections were duly noted in the record.

FURTHER AFFIANT SAITH NOT.

s/s J. Ward Vandegrift

J. WARD VANDEGRIFT, JUDGE

*R.* at 221.

The jury asked the bailiff for a dictionary, the bailiff told the judge of their request, and he responded by having a dictionary sent to them. Insofar as "communication" is concerned, there was very little.

The standard of appellate review of such communications has been established by our Supreme Court. The failure to bring the jury into open court to communicate with the judge

does not constitute reversible error unless some harm or prejudice has been suffered by the objecting party. When an irregularity such as this occurs harm will be presumed, and if the irregularity is not explained, a reversal of judgment should follow. However, if an explanation for the alleged misconduct is offered, and if this court is satisfied that no harm or prejudice resulted, then the judgment of the trial court will not be disturbed.

*Conrad v. Tomlinson* (1972), 258 Ind. 115, 279 N.E.2d 546, 551. The Supreme Court has thus rejected a *per se* rule in presuming prejudice from any judge-jury communication.

The *Conrad* standard has been analyzed in numerous subsequent cases. In *Frasier v. State* (1974), 262 Ind. 59, 312 N.E.2d 77, *cert. denied*, 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 686, the Supreme Court amplified its earlier holding. "The important point is not who offers an explanation but that this court be satisfied that 'no harm or prejudice resulted' from the misconduct of the bailiff." *Id.* at 81-2. And again, in *Gann v. State* (1975), 263 Ind. 297, 330 N.E.2d 88, the court held; "No words or actions of the bailiff having been shown to have prejudiced appellant, a new trial is not warranted." *Id.* at 92. In *Gann*, the court reiterated that misbehavior or irregularity on the part of the jury must—in order to warrant a new trial—be gross and it must be shown to have *probably* injured the accused. *Id.* at 91.

The scope of what has been considered proscribed communication can be discovered by comparing the fact situations presented by the case law. No error was found when a bailiff discussed missing verdict forms with the jury and then told the judge about the problem. *Fruehauf Trailer Division v. Thornton* (1977), Ind.App., 366 N.E.2d 21. This court has recently had occasion to analyze *Gann, Frasier, Conrad,* and *Fruehauf Trailer*:

> The rule of these cases is that if the communications do not involve any material issue of the case nor play a role in the decision on the merits of the verdict, no prejudice is shown.

*City of Indianapolis v. Ervin* (1980), Ind. App., 405 N.E.2d 55, 65. So we conclude that the mere act of a jury requesting a dictionary and a judge responding thereto without consulting counsel or calling the jury into open court does not *per se* constitute reversible error. Our conclusion is in keeping with an appellate court case which reached the same conclusion, albeit without the benefit of exposition. *Indianapolis Power & Light Company v. Moore* (1936), 103 Ind.App. 521, 5 N.E.2d 118 (bailiff took several volumes of a dictionary into the jury). Also supportive although not directly in point, is *Anderson v. Taylor* (1972), 154 Ind.App. 217, 289 N.E.2d 781, in which the trial court refused to send a dictionary into the jury room at the jury's request and did not call the jury into open court or inform counsel. The party alleging error in *Anderson,* as here, argued that I.C. 34–1–21–6,[1] providing for further instructions to the jury, governs when the jury requests a dictionary. That position was expressly rejected by the court in *Anderson* :

> The above quoted statute does not require the court to bring the jury back into open court on a request for a dictionary. The statute requires the calling of the jury back into the jury box *only when* "there is a disagreement between them as to any part of the testimony, or if they

desire to be informed as to any point of law arising in the case."

*Id.* at 786 (emphasis in original). Consequently, it seems to be established in this court that the mere act of a jury requesting a dictionary and the response thereto by the judge does not constitute communication rising to the level that requires the jury to be brought into court.

Defendant relies on *Deming v. State* (1956), 235 Ind. 282, 133 N.E.2d 51, for the proposition that all communications from the judge to the jury pertaining to substantive rights of a defendant must be made in open court. We do not question that formulation of the law as a general rule. In *Deming,* however, the court answered questions regarding defendant's chances of parole. In *Laine v. State* (1972), 154 Ind.App. 81, 289 N.E.2d 141, the bailiff undertook to explain verdict forms to the jury. In *Sparks v. State* (1972), 154 Ind.App. 691, 290 N.E.2d 793, the bailiff advised the jury of the meaning of the term "disfranchisement." In each of these cases, the bailiff became actively involved in matters relevant to jury deliberations. The contrast between the substantive communications which occurred in the foregoing cases and the simple request for an object which was answered only by the delivery of the object in this case is thus clear. The communication between the jury, bailiff, and judge was not one requiring the jury to be brought into open court.

We now consider whether it was error to allow the jury access to the dictionary itself.

*ISSUE TWO*—Did the court commit reversible error by providing a dictionary to the jury during their deliberation, at their request, without first consulting with counsel for both sides?

*CONCLUSION*—The court did not commit reversible error by allowing the jury access to the dictionary.

---

1. Further instructions—After the jury have [has] retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any point of law arising in the case, they may request the officer to conduct them into court, where the information shall be given in the presence of, or after notice to, the parties or their attorneys.

As indicated by our previous discussion, the only Indiana case in which a dictionary was allowed to go to the jury is *Indianapolis Power & Light Company v. Moore, supra.* No reversible error was found because there was no indication the jury deliberations were affected or that harm resulted. The other Indiana case in which the propriety of a dictionary in the jury room was raised as an issue is *Anderson v. Taylor, supra.* In *Anderson*, the jury's request for a dictionary was refused by the trial court. Dicta from that case, however, give some indication as to the course Indiana courts might follow:

> The request for a dictionary ... could have been for one of many, many reasons. The judge having instructed the jury as to the law and the jury asking for a dictionary and not explaining why they wanted it was no justification for the court to bring them back into open court and ask them what they wanted with the dictionary.

*Id.* at 787. Thus by implication *Anderson* seems to recognize that a dictionary could be used by a jury for bona fide purposes and prejudice will not be presumed.

Judging from these two cases in our court, Indiana so far has followed what has been called the "majority rule" as to the propriety of supplying a dictionary to the jury:

> Most of the jurisdictions which have passed upon the question proceed on the basis, more often implied than expressed, that prejudice to the complaining party is not presumed but must affirmatively appear in order to require or justify a reversal or a new trial, and in most of the cases it has been found that no prejudice resulted.

54 A.L.R.2d at 738–39.

Considerable authority is provided for this position by other jurisdictions. The difference between the two alternatives is illustrated by this comparison:

> With respect to a jury's use of a dictionary during deliberations, the conflict in principle is represented on the one hand by the view of the Alabama court [in *Dulaney v. Burns* (1928) 218 Ala. 493, 119 S. 21] that 'the definition of words in our standard dictionaries is taken as a matter of common knowledge, which the jury is supposed to possess,' and on the other hand by the view of the New Jersey Superior Court [in *Palestroni v. Jacobs* (1950) 10 N.J.Super. 266, 77 A.2d 183] that 'the use by a jury of a dictionary has an obvious potentiality for harmful influence.'

54 A.L.R.2d at 739. The minority rule, a stringent one, is represented by *Palestroni, supra,* in which a definition of the word "wainscoting" was sought by the jury. Despite the fact that definition did not impinge upon the province of the trial court in defining legal terms, and despite the fact that it could reasonably be expected that knowledge of the meaning of that word would assist the jury in grasping the facts of the case, reversal was mandated. We believe the better view is manifested in cases such as *United States v. Gunter* (10th Cir. 1976) 546 F.2d 861, *cert. denied* 430 U.S. 947, 97 S.Ct. 1583, 51 L.Ed.2d 794. There the jury, while deliberating, asked the judge to define a word. He sent a dictionary into the jury room. The court held that "such may well have been error, but if it be deemed error, it was most certainly harmless error. No prejudice has been shown." *Id.* at 869. *Accord, Lane v. Mathews* (1952), 74 Ariz. 201, 245 P.2d 1025, 1028 (acquisition of dictionary by jury "at most harmless error"); *Pulkrabek v. Lampe* (1956), 179 Kan. 204, 293 P.2d 998, 1000 (dictionary given to jury in a civil case, trial court decision affirmed on the basis that not every misconduct is grounds for reversal, even in criminal cases); *Matters v. State* (1930), 120 Neb. 404, 232 N.W. 781; *Wilson v. State* (1973), Tex.Cr., 495 S.W.2d 927 (no reversible error by providing dictionary to jury because no "unusual" definition of terms found); *I. C. T. Insurance Company v. Wineman* (1957), (Tex.Civ.App.), 308 S.W.2d 549; *Rocky Mountain Trucking Co. v. Taylor* (1959), 79 Wyo. 461, 335 P.2d 448 (civil case in which jury asked for a dictionary and the bailiff delivered it held: no error presumable, therefore affirmed.)

In concluding that the majority rule was the best choice, the Iowa court in *In Re Estate of. Cory* (1969) (Iowa) 169 N.W.2d 837, 845, relied on the rationale of *Dulaney v. Burns* (1928) 218 Ala. 493, 119 S. 21:

> The definition of words in our standard dictionaries is taken as a matter of common knowledge, which the jury is supposed to possess. There is nothing to indicate that the jury did not give full effect to the definition of 'undue influence' as a legal term given by the judge in his charge.

*Dulaney* at 25, *Corey* 169 N.W.2d at 846. *See also Goss v. State* (1933), 123 Tex.Cr. 494, 59 S.W.2d 379, 379.

So we agree with the majority rule that the presence of a dictionary in the jury room during deliberations does not raise a presumption of prejudice. Prejudice must affirmatively be demonstrated. None was shown. Accordingly, we find no reversible error on the part of the trial court in this regard.

*ISSUE THREE*—Does the physician-patient privilege prohibit the trial court from admitting testimony of the hospital employee regarding the results of her analysis of Shultz's blood sample when the sample was initially requested by a doctor and the doctor did not testify?

*CONCLUSION*—The evidence admitted through the testimony of the hospital employee was not barred by the physician-patient privilege.

At the outset, we agree with Shultz's argument that the technician who drew his blood acted at the behest of a doctor who was treating Shultz and was therefore included under the doctor-patient relationship. *Aetna Life Ins. Co. v. Deming* (1889), 123 Ind. 384, 24 N.E. 86; *Stalker v. Breeze* (1917), 186 Ind. 221, 114 N.E. 968. However, we find no error in the admission of the technician's testimony.

In this criminal prosecution, defendant Shultz took the stand. In the course of his testimony under direct examination, the following exchange occurred:

Q. Had you been drinking?

A. Yes sir.

Q. Did you feel like you were intoxicated?

A. No sir. But I had been taking cold medicine too, I had been taking like contact and I had been taking Robitussin, cough syrup, which is something like six percent alcohol, with codein.

Q. The basic issue would be your intoxication, did you feel like you were intoxicated?

A. No sir.

Q. Did you feel that your driving would be impaired due to the medication and the alcohol that you had consumed?

A. No sir, because I drove all the way from Kokomo.

. . . . .

Q. Had you anything to drink from the time you left Kokomo until the time of the accident?

A. Yes sir.

Q. What did you have to drink?

A. I stopped by my sister's boyfriend's house and she was there and I drank two tallboys of Strohs.

Q. O.K., how many ounces would those be?

A. Well, they are half a quart.

Q. That would be a pint?

A. That would make it a quart all together.

*R.* at 186–87.

Shultz's testimony was completely voluntary. It could not be compelled, *Ind. Const.* Art. 1, § 14; *U.S.Const., Amend.* 5; *Collins v. State* (1977), 266 Ind. 430, 364 N.E.2d 750; *Ashby v. State* (1976), 265 Ind. 316, 354 N.E.2d 192, nor does Shultz allege any compulsion. It is well settled that the physician-patient privilege is waived by a party's voluntary testimony.

The party's own voluntary testimony, on trial, to his physical condition in issue,

should be a waiver of the privilege for the testimony of a physician who has been consulted about the same physical condition in issue; the reasons here being merely somewhat stronger than those above noted. Certainly it is a spectacle fit to increase the layman's traditional contempt for the chicanery of the law, when a plaintiff describes at length to the jury and a crowded court room the details of his supposed ailment and then meekly suppresses the available proof of his falsities by wielding a weapon nominally termed a privilege.

VIII *Wigmore on Evidence*, § 2389 at 833–34. *Accord Lane v. Boicourt*, (1891), 128 Ind. 420, 27 N.E. 1111.

 Although Wigmore's language is addressed to the civil litigant, the same reasoning would seem to apply to criminal defendants as well. Unlike parties to civil litigation, their testimony cannot be compelled due to the constitutional protections afforded them. These protections, coupled with reluctance of courts to expand the privilege,[2] lead us to conclude that the voluntary testimony of a criminal defendant as to his physical condition when that physical condition is in issue waives the physician-patient privilege. *Green v. State* (1971), 257 Ind. 244, 274 N.E.2d 267; *Summerlin v. State* (1971), 256 Ind. 652, 271 N.E.2d 411 (when defendant makes mental condition justiciable issue in criminal proceeding, he waives any privilege); *see also K. Olson, A*

*Look at Indiana Code 34–1–14–5: Indiana's Physician-Patient Privilege* (1973) 8 *Val.U. L.Rev.* 37. As Shultz testified in considerable detail regarding his condition, he waived the privilege.[3]

*ISSUE FOUR*—Did the trial court err in admitting evidence as to the blood alcohol content of Shultz when the technician who analyzed the blood and testified regarding it was not certified by the Indiana State Department of Toxicology?

*CONCLUSION*—The trial court did not err in admitting evidence as to the blood alcohol content of Shultz.

Shultz contends that the court erred in admitting the testimony of a laboratory technician who was not certified by the Indiana State Department of Toxicology. To resolve this issue we must journey into the realm of administrative law.

 In 1976, the State Department of Toxicology promulgated regulations requiring the certification of chemical test operators "who analyze blood, urine or body materials." 260 IAC 1–4–2. Those regulations were promulgated pursuant to statutory authority found at I.C. 9–4–4.5–6. In 1976, at the time the regulation in question was promulgated, I.C. 9–4–4.5–6 appeared to include *all* types of chemical test operators.[4] The statute was amended in 1978,

---

**2.** "Certain it is that the practical employment of the privilege has come to mean little but the suppression of useful truth,—truth which ought to have been disclosed and would never have been suppressed for the sake of any inherent repugnancy in the medical facts involved.... There is little to be said in favor of the privilege, and a great deal to be said against it." *Wigmore, supra,* § 2380a, at 814.

**3.** This issue has been resolved by the legislature through the passage of I.C. 9–4–4.5–7 (effective date September 1, 1980). That statute specifically narrows the scope of the physician-patient privilege to exclude the results of chemical tests on blood when a prosecutor or his deputy requests the results as a part of a criminal investigation. Because trial in this case was held on March 24, 1980, we decide this issue under what is now prior law.

Additionally this case is distinguishable from *Alder v. State* (1958), 239 Ind. 68, 154 N.E.2d 716. In that case there was no waiver of the privilege by the defendant because he did not testify as to his condition.

**4.** I.C. 9–4–4.5–6 Chemical test operators—Selection, training and certification—Inspection of chemical devices.—The director of the state department of toxicology of the Indiana University school of medicine is hereby authorized and empowered to adopt the necessary rules and regulations to set standards for the selection, training, certification and recertification of chemical test operators and to provide for the periodic inspection of chemical devices. No chemical test for intoxication shall be considered as evidence for the purpose of this chapter [9–4–4.5–1—9–4–4.5–6] if it is not performed by a person certified as a valid operator by the state department of toxicology of the

however. As amended, it specifically discusses *only* the certification of breathalyzer test operators.[5] By amending the statute to narrow its scope the legislature clearly intended to, and did, include only breathalyzer operators and test devices under the statute. That hoary maxim of statutory interpretation, *expressio unius est exclusio alterius*, works against Shultz, as does the elementary principle of administrative law that an administrative agency or department can only promulgate regulations which fall within the scope of the agency's enabling legislation. This has long been true in Indiana.

A specific legislative yardstick is provided, which cannot be broken or shortened by an administrative regulation. Rules and regulations promulgated by administrative boards must be reasonable, and such boards cannot enlarge or vary, by the operation of such rules, the power conferred upon them by the Legislature, or create a rule out of harmony with the statute. *Any regulation which is in conflict with the organic law or statutes of the State is wholly invalid. Blue v. Beach*, (1900) 155 Ind. 121, 56 N.E. 89; *Wallace v. Feehan*, (1933) 206 Ind. 522, 190 N.E. 438. (Emphasis added.)

*Ind. Emp. Sec. Div. v. Ponder* (1950), 121 Ind.App. 51, 92 N.E.2d 224, 228. *Accord, Indiana Department of State Revenue v. Colpaert Realty Corp.* (1952), 231 Ind. 463, 109 N.E.2d 415; *Gallagher v. Marion County Victim Advocate Program, Inc.* (1980) (Ind.App.) 401 N.E.2d 1362, 1368 ("Being creatures of the legislature, administrative bodies cannot make rules except as the legislature empowers them, otherwise they are invalid.") *See also, Indiana Department of*

*State Revenue v. Cave Stone, Inc.* (1980) (Ind.App.) 409 N.E.2d 690.

"[A]n administrative agency acts like a 'little legislature' and, within the limits of the authority delegated to it, exercises the same sort of discretionary powers as those exercised by a legislature."

1 F. Cooper, *State Administrative Law,* (1965) at 32. Any discretion vested in an administrative agency must be delimited by statutory authority delegating that discretion to it. Federal law is the same. *See, e. g., United States v. Southwestern Cable Company* (1968), 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001. In discussing the Federal Communications Commission the court held that the Commission may issue "such rules and regulations and prescribe such restrictions and conditions, *not inconsistent with law.*" *Id.* at 178, 2005 (emphasis added). By its failure to amend its regulations consistent with the restriction of the scope of the enabling legislation under which they were originally promulgated, an agency cannot retain power which it has lost through legislative amendment. While this court recognizes that the delegation of legislative power is necessary for the effectiveness of modern government, K. Davis, *Administrative Law Text* (3d ed. 1972) § 1.02 at 3–4, we also recognize that the legislature's prerogative to control that power should be assiduously respected.

Accordingly, we conclude that the 1978 amendment of I.C. 9–4–4.5–6 to include only breathalyzer operators and machinery under the Department of Toxicology certification program implicitly limited the broader scope of the administrative regulations which had been passed under the earlier enabling legislation. Consequently,

---

Indiana University school of medicine, and no equipment shall be used for such chemical tests which has not been inspected and approved under the rules and regulations adopted by such department. Rules and regulations promulgated pursuant to IC 1971, 9–4–4–3 [repealed] are hereby preserved for the purposes of this chapter and may be amended pursuant to the authority herein granted.

**5.** I.C. 9–4–4.5–6. Chemical test operators—Selection, training and certification—Inspection of chemical devices.—The director of the de-

partment of toxicology of the Indiana University school of medicine is authorized to adopt the necessary rules and regulations to set standards for the selection, training, certification and recertification of breathalizer test operators and to provide for the periodic inspection of breathalizer test devices. No breathalizer test shall be considered as evidence for the purpose of this chapter if it is not performed by a person certified as a valid operator by the department. . .

Shultz cannot rely upon an outdated regulation, 260 IAC 1–4–2, to exclude the testimony of the uncertified toxicology analyst.

 Because the analyst who ran the tests and testified was experienced in her work (20 years, *R.* at 175) and followed a specific scientifically acceptable procedure in analyzing the blood, the trial judge operated within the scope of his discretion in admitting her testimony. *State v. Vaughn* (1962), 243 Ind. 221, 184 N.E.2d 143; *Linton-Summit Coal Company v. Hutchison* (1953), 232 Ind. 369, 111 N.E.2d 819.[6]

*ISSUE FIVE*—Were Shultz's constitutional rights against self-incrimination and unlawful search and seizure violated by the admission of testimony regarding a blood sample drawn, while Shultz was conscious, without his consent?

*CONCLUSION*—The testimony regarding the blood sample was properly admitted.

Shultz attempts to distinguish this case from the ruling constitutional precedent of *Schmerber v. California* (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. In *Schmerber* the defendant was convicted of driving an automobile while under the influence of intoxicating liquor. He had been arrested at a hospital while receiving treatment for injuries suffered in an accident involving the automobile that he had apparently been driving. At the direction of a police officer, a blood sample was then withdrawn from defendant's body by a physician at the hospital. Upon analysis, this sample revealed a blood alcohol content which indicated intoxication, and the report of this analysis was admitted into evidence at the trial. The defendant in *Schmerber* objected to the receipt of the evidence on the ground that the blood had been withdrawn despite his refusal to consent to the test. The *Schmerber* Court held that no violation of defendant's rights had occurred and that the evidence had therefore been properly admitted.

 The similarities between the case at bar and *Schmerber* are striking. Shultz attempts to distinguish this case from *Schmerber* on the grounds that his blood was drawn prior to his arrest. This distinction is not persuasive. The record shows that in all probability Shultz was under arrest at the time the blood was drawn. When Shultz was asked whether a police officer had said anything to him about the blood sample he replied, "Well, no sir, he just come in and he looked at me and he looked down at me and said, 'Well, you know you are going to be arrested, don't you? You have been drinking.'" *R.* at 186. Shultz was taken into police custody as soon as he emerged from the emergency room. It is apparent from the record that police intended to arrest Shultz, had probable cause to do so, and informed him they intended to do so at the earliest possible time. Although one of the officers testified that she did not consider Shultz to be in custody at the time he was in the emergency room, the conduct of the police and Shultz's testimony as to what was communicated to him supports the inference that, as in *Schmerber*, this blood test was drawn as a search incident to a lawful arrest. As a court of appeal we must construe the evidence favorably to the verdict of the trial court. T.R. 52(A); *Jones v. State* (1978), 268 Ind. 640, 377 N.E.2d 1349; *Poindexter v. State* (1978), 268 Ind. 167, 374 N.E.2d 509.

 The determination by the Supreme Court in *Schmerber, supra,* that there was no constitutional impediment to drawing a blood sample to determine the physical condition of a suspect provides a basis for Indiana statutes on the subject. I.C. 9–4–4.5–1 provides, *inter alia,* that "[a]ny person who drives ... a vehicle on the public highways of this state shall be deemed, by virtue of such driving, ... to have given his implied consent to submit to a chemical test for intoxication when asked to submit to such tests by any law enforcement officer."

6. The recent case of *Hartman v. State* (1980), Ind.App. 401 N.E.2d 723, is not dispositive of this issue because it dealt only with breathalyzers, which are still included under the Department of Toxicology regulations.

I.C. 9–4–4.5–2 defines "chemical test" as including blood tests taken for the determination of the presence of alcohol or a controlled substance. Thus, despite his protestations to the contrary, Shultz did indeed consent to the blood test in question. The gist of his argument going to this issue implies that because the doctor who ordered the blood test did not testify as to a medical necessity for the test, it was taken for the sole purpose of determining Shultz's blood alcohol content. Shultz argues that the search was unlawful because of his lack of consent. Assuming without deciding that there was indeed a "search" conducted by the doctor, Shultz impliedly consented to that search by driving his car on an Indiana highway. *Clark v. State* (1978) (Ind.App.) 372 N.E.2d 185; *State v. Hummel* (1977) (Ind.App.) 363 N.E.2d 227, *cert. denied* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978). Assuming, alternatively, that there was no search but that instead the test was taken for medical purposes, Shultz waived any privilege adhering to medical communications by testifying in detail as to his physical condition (Issue Three, *supra*). The Supreme Court's determination in *Schmerber*, coupled with the Indiana statutes establishing implied consent on the part of drivers, dispose of Shultz's contentions regarding this issue.

■ There is yet another basis for the legitimacy of the drawing of the sample. The required exigent circumstances, *Arkansas v. Sanders* (1979), 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235, were present in this case because of the metabolic destruction of the evidence which was present in Shultz's blood. *Schmerber v. California, supra; Devaney v. State* (1972), 259 Ind. 483, 288 N.E.2d 732; *Maxey v. State* (1969), 251 Ind. 645, 244 N.E.2d 650; *Clark v. State, supra.*

Thus we find there were three grounds justifying the drawing of the blood test. First, that, as in *Schmerber*, it was a search incident to a lawful arrest, and, second,

Shultz impliedly consented to the test by virtue of Indiana statutes supported by *Schmerber*, and finally, exigent circumstances rendered the requirement of a search warrant inapplicable in this situation. We therefore hold that Shultz's rights were not violated and that the evidence of intoxication revealed by analysis of the blood test was properly admitted.

Having disposed of all issues in a manner favorable to the holdings of the trial court, the judgment is

AFFIRMED.

NEAL, J. (sitting by designation), concurs.

SULLIVAN, J., dissents with opinion.

SULLIVAN, Judge, dissenting.

I respectfully dissent from the majority's treatment of issues One and Two. The majority cites to the annotation found at 54 A.L.R.2d 738 for the majority and minority rules as to the propriety of supplying a dictionary to the jury. The majority rule never presumes prejudice. Such must be affirmatively shown. The minority position presumes reversible error. In light of *Conrad v. Tomlinson* (1972) 258 Ind. 115, 279 N.E.2d 546, I believe Indiana follows the position, represented by the majority of cases within the majority rule, which requires judicial awareness of the word or words the jury wishes to define before harmless error can be found. *See generally* Annot., 54 A.L.R.2d 728 (1957); 49–55 A.L.R.2d *Later Case Service* (1978 & Supp.1980). Accordingly, I believe reversal of Shultz's conviction is required.[1]

*Conrad* clearly provides that harm *will* be presumed *unless* an explanation for the misconduct is offered which demonstrates that no harm or prejudice resulted. 279 N.E.2d at 551. While it is true that our courts have been rather liberal in determining what constitutes an "explanation", see cases cited in Majority at page 1131, the *Conrad*

---

1. In separating the fact of communication from the fruits, i. e., the dictionary, the majority has failed to apply *Conrad* to the second issue. This is clearly in error as the jury's acquisition

of the dictionary was an integral part of the alleged improper communication. *See Sparks v. State* (1st Dist. 1972) Ind.App., 290 N.E.2d 793, 795.

presumption of harm absent some sort of elucidation has never been repudiated. The reason for this is clear: without some amplification the alleged impropriety must be viewed in a vacuum, it cannot be placed in context to determine if its ultimate effect was harmless.

Our recent case of *City of Indianapolis v. Ervin* (2d Dist. 1980) Ind.App., 405 N.E.2d 55, involved an issue similar to that presented here. After acknowledging the *Conrad* standard of review for alleged irregularities in jury deliberations, *id.* at 64, ("harm will be presumed until an explanation . . . is offered"), we found no prejudice had resulted from communications between the bailiff and the jury. Fundamental to this finding was the fact that the contents of the communications were sufficiently described to allow us to determine that they did not "involve any material issue of the case nor play a role in a decision on the merits of the verdict." *Id.* at 65. Basic to the explanation required by *Conrad*, then, is an inspection of the substance of the communication.

The cases cited by the majority for the general rule that harm will not be presumed from the jury's acquisition of a dictionary can, for the most part, be reconciled with the *Conrad* standard of review. In most instances the court was aware of the words the jury wished to have defined, and therefore could make an informed decision as to the propriety of the jury's request for a dictionary. On review, the request and the use could be viewed in context to determine if the error was harmless. In the vernacular of *Conrad* the reviewing court had an explanation for the trial court's action sufficient to determine that no harm or prejudice resulted therefrom. *See, e. g., United States v. Gunter* (10th Cir. 1976) 546 F.2d 861, 869 (jury requested a definition of "tacitly"); *In re Estate of Cory* (Iowa 1969) 169 N.W.2d 837 ("undue" and "undue influ-

ence" defined); *Wilson v. State* (Tex.Cr. 1973) 495 S.W.2d 927, 927 (dictionary was used to define "care", "custody", and "control"); *Rocky Mountain Trucking Co. v. Taylor* (1959) 79 Wyo. 461, 335 P.2d 448 ("proximate", "negligence" along with others defined).

In sharp contrast to the situations related above the trial court here had no idea what word or words the jury intended to define. In response to the bare request for a dictionary one was provided.[2] We have no method, outside of speculation, to determine that no prejudice resulted from this act. In short, there is no adequate explanation of the situation from which we could find harmless error. Thus, under the *Conrad* standard, we must presume that harm resulted.

I would also note with respect to issue Five that the blood sample was taken at the request of a hospital physician and was standard procedure for all emergency room patients. There is no indication that the police were involved in taking Shultz's blood without his consent. This is, of course, dispositive of the issue since the State and Federal Constitutions provide no protection against purely private action. *Zupp v. State* (1972) 258 Ind. 625, 283 N.E.2d 540.

---

2. In this context I cannot agree with the majority's statement that *Anderson v. Taylor* (1st Dist. 1972) 154 Ind.App. 217, 289 N.E.2d 781, "seems to recognize that a dictionary could be used by a jury for bona fide purposes and prejudice will not be presumed" (at 1133). The court in *Anderson* was reviewing for error the trial court's denial of the jury's request for a dictionary. The disposition of the alleged error actually supports the position that the jury should proffer some explanation for their request, i. e., should state which words need be defined, before it is even worthy of consideration. *Id.* at 787.