Troy **ZIMMERMAN**, Appellant (Defendant Below),

v.

**STATE** of Indiana, Appellee (Plaintiff Below).

No. 4–184A17.

Court of Appeals of Indiana, Fourth District.

Oct. 2, 1984.

 .

 .

Jerrald A. Crowell, Bowman, Crowell & Teeters, Fort Wayne, for appellant.

Linley E. Pearson, Atty. Gen., Jay Rodia, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Presiding Judge.

In the Adams County Circuit Court, a jury convicted Troy Zimmerman of driving while intoxicated, his second such conviction after June 30, 1978, making the offense a class D felony under IND.CODE section 9–4–1–54(b)(1) (1982).[1] Combined and restated, the issues raised by Zimmerman's appeal are as follows:

I. Whether the trial court erred in admitting evidence of a test performed on a sample of Zimmerman's blood?

II. Whether the trial court erred in refusing to instruct the jury in accordance with Zimmerman's tendered instruction number 17, which related to the State's failure to in-spect and certify the equipment on which Zimmerman's blood was tested, as required by Department of Toxicology regulations?

III. Whether the evidence was sufficient to support the verdict of the jury and the judgment of the trial court?

Finding no error requiring reversal, we affirm the judgment of the trial court.

### FACTS

The evidence most favorable to the verdict shows that at about noon on Saturday, June 19, 1982, Troy Zimmerman and his uncle, Rick Zimmerman, met at a service station in Decatur, Indiana. They got into Troy's car, a black Chevrolet Camaro Z–28, and Troy drove them to a liquor store, where they purchased two quarts of beer and a pint of peppermint schnapps. After driving around and drinking for over an hour, they decided to visit some friends and relatives at Crooked Lake, about two hours north of Decatur. On the way, having drunk the alcohol they had purchased, they stopped and bought two more quarts of beer. At the lake, Rick did not see Troy drink any alcohol, but they were separated for about 45 minutes while Rick went skiing, and Rick testified their friends at the lake were drinking.

Rick drove himself and Troy back to Decatur, stopping on the way to buy two more quarts of beer. At about 8:30 P.M., they arrived at the service station where they had met. The station owner saw Troy stumble when he got out of the car and Troy merely mumbled a response when warned not to use one of the restrooms at the station. After purchasing some gasoline, Troy drove Rick home.

Three witnesses testified that between 9:00 and 9:30 P.M., they each observed a black Camaro Z–28 driving around Decatur in an erratic manner, such as speeding, passing on the right shoulder of a two lane road, swerving between lanes, and making

---

1. Repealed by Act of April 19, 1983, P.L. 143–1983, § 9, 1983 Ind.Acts 989, 1003. For current version, see IND.CODE § 9–11–2–3 (Supp.1983).

The law in effect at all times relevant to this case was the 1982 version.

a right turn from a through lane. One of the witnesses identified Troy as the driver of the Camaro and another reported his observations to the Decatur police. Orville Steinman, not a resident of Decatur, testified that he was driving slowly east on state road 224, looking at street signs for the road that would take him to a friend's house. As he prepared to make a right turn on Stadium Drive, he heard a motor rev and saw a car pass him on the left in a no-passing zone. At the same instant, a red Ford exited Stadium Drive to turn west on 224. Steinman saw the car passing him, a black Camaro, smash with tremendous impact squarely into the driver's side of the Ford.

Officer Tobin Ray, of the Decatur Police Department, was the first policeman on the scene. He found Troy lying in the front seat of another car, to which Troy had been removed by another person at the scene. Officer Ray noticed that Troy was bleeding from the mouth and smelled strongly of alcohol. Officer Richard Noack arrived at the scene and told Officer Ray to stay with Troy and accompany him to the hospital because a blood sample would need to be taken to test Troy for intoxication. Officer Noack checked the red Ford automobile and found its driver was already dead. In Troy's car, he found a half-full quart bottle of beer and an empty wrapper for a twelve-pack of beer, but no other beer cans or bottles.

Officer Ray rode with Troy in the ambulance to the Adams County Memorial Hospital emergency room. Troy was conscious and coherent, although nervous and emotionally upset because of the seriousness of the automobile accident. Some of his teeth had been shoved back into the gums, and he had some lacerations about the face and on his left arm. He was never diagnosed as having a concussion or other injury to the brain. At the hospital, Officer Dallard Tackett, of the Indiana State Police, read Troy the blood alcohol test consent form, which Troy signed while lying on his back as a hospital employee held the clipboard. Three witnesses testified that Troy appeared coherent and able to understand what he was doing when he signed the consent form.

One of the hospital employees drew a blood sample from Troy's arm and inserted it into a blood alcohol sample kit provided by the Indiana State Police. Officer Ray took the completed sample kit, placed it in his locker at the police station, and mailed it to the state laboratory in Indianapolis on Monday, June 21. Robert Reed, chemist for the state laboratory, received the blood sample on Wednesday. Reed testified about the makeup of the sample kit, the procedures involved in testing the blood, and the result of the test of Troy's blood, which revealed a blood alcohol content of .19%. He also testified that the equipment on which Troy's blood sample was tested had been last certified by the Indiana Department of Toxicology on June 23, 1981, one year and one day before the analysis of Troy's blood sample was performed.

On September 3, 1982, an information was filed against Troy Zimmerman, which, after amendments, charged him with reckless homicide, IC 35–42–1–5, and driving while under the influence, IC 9–4–1–54. Part two of the second count also alleged that Troy had a previous conviction for driving while under the influence after June 30, 1978, elevating the charge from a Class A misdemeanor to a Class D felony under IC 9–4–1–54(b)(1). Troy filed a motion to suppress all evidence of the blood test on the grounds that he was not under arrest at the time the blood sample was taken, he did not knowingly consent to the test, and the sample was taken at the direction of a law enforcement official, but the results were not requested by a prosecutor as part of a criminal investigation (*see* IC 9–4–4.5–7; repealed; for current version, see IND.CODE § 9–11–4–6 (Supp. 1983)). After hearing evidence on the motion to suppress, most of which went to the issue of voluntary consent, the trial court denied the motion.

On February 1, 1983, the trial court held a hearing on a proposed plea agreement.

The court refused to accept Troy's guilty plea, stating:

"Number one I believe there is a reluctance on the part of Mr. Zimmerman in regard to this plea as I have indicated previously. Number two Mr. Zimmerman has not been able to establish the facts in the case—the charges. He says he is guilty. He says he does all these things and yet he tells the court he cannot remember [the events of June 19, 1982]. And I am sure he is being sincere. But I don't think there has been any basis established in fact that he has committed the charges of which he is charged with. I feel that for that reason it is not freely and voluntarily entered. And I cannot accept the plea of guilty."

(R. 284). On the basis of this statement by the trial court, Troy filed a motion to have the court reconsider the motion to suppress, reasoning that if the court believed Troy was sincere when he said he could not recall the events of June 19, 1982, then the court must also believe Troy could not have consented freely and voluntarily to the blood test. The trial court refused to reconsider the motion to suppress.

After the trial on April 12–13, 1983, the jury returned a verdict acquitting Troy of reckless homicide and convicting him of operating a vehicle while intoxicated. A second phase of the trial was held in which the jury found that Troy had a previous conviction for driving while under the influence after June 30, 1978, increasing the classification of the present offense to a Class D felony. Troy brings this appeal, raising the issues enumerated above. We affirm.

### DECISION

#### I.

Troy alleges the trial court erred in admitting evidence of the blood test and the results thereof. In support of this allegation of error, Troy argues: (1) he did not freely and voluntarily consent to the taking of a sample of his blood; (2) he was not in custody at the time the blood sample was taken and there was no probable cause for his arrest at that time; (3) the blood sample was not taken pursuant to a lawful arrest, because he was not arrested until two and a half months after the blood test was taken; (4) the taking and testing of his blood sample were in violation of IND. CODE section 9–4–4.5–7 (1982) (repealed; for current version, see IND.CODE § 9–11–4–6 (Supp.1983)); (5) the state failed to lay a proper foundation for the testimony of Robert Reed, concerning the results of the analysis of Troy's blood because (a) the State's evidence of the chain of custody of the container into which the blood sample was placed was insufficient to prove the container was sterile, and (b) the State failed to prove the equipment on which the blood sample was analyzed had been inspected and certified by the Indiana Department of Toxicology, as required by department regulation 260 IAC 1–5–2(1979).

Troy's first three arguments may be addressed together, inasmuch as they are all directed at the reasonableness of the seizure of evidence of his intoxication (the blood sample) without a warrant. Article 1, section 11 of the Indiana Constitution, and the fourth and fourteenth amendments to the United States Constitution guarantee residents of Indiana protection against unreasonable searches and seizures by law enforcement agents. Where a search and seizure is effected without a search warrant, the state bears the burden of proving the search fell within one of the well delineated exceptions to the warrant requirement. *Murrell v. State*, (1981) Ind., 421 N.E.2d 638, 640 (citing *United States v. Jeffers*, (1951) 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59).

A valid consent to a search, given by the person from whom evidence is seized, is recognized as an exception to the warrant requirement under Indiana law. *Hill v. State*, (1978) 267 Ind. 480, 371 N.E.2d 1303; *Brames v. State*, (1980) 273 Ind. 565, 406 N.E.2d 252. A valid consent must be voluntarily given. *Brames*, 406 N.E.2d at 255. Troy argues that because he was traumatized by his injuries at the

time he signed the blood alcohol test consent form and because he was later unable to recall signing the form or having it read to him, he was unable to understand the nature of his consent to the taking of the blood sample, and it was, therefore, not voluntarily given. In reviewing the trial court's determination of the admissibility of evidence, however, this court will not reweigh the evidence, but will look only to the evidence most favorable to the trial court's ruling. *Rihl v. State,* (1980) Ind. App., 413 N.E.2d 1046, 1049. Two witnesses who testified at the hearing on Troy's motion to suppress and a third witness at trial all testified that at the time he signed the consent form, Troy appeared to be coherent and to know what he was doing. The hospital employee who drew the blood sample testified that Troy did not object to her doing so. None of the witnesses gave any evidence that Troy was pressured in any way into signing the consent form. We find the evidence supports the trial court's ruling that Troy voluntarily consented to the taking of his blood sample. *See Clark v. State,* (1978) 175 Ind.App. 391, 372 N.E.2d 185.

Our holding is reinforced by our decision in *Pollard v. State,* (1982) Ind.App., 439 N.E.2d 177, and in *Shultz v. State,* (1981) Ind.App., 417 N.E.2d 1127. In *Pollard,* we stated:

"In *Shultz v. State,* (1981) Ind.App., 417 N.E.2d 1127 (*transfer denied*), the defendant, while being treated in a hospital emergency room for injuries received in a wreck, had a blood sample withdrawn. The trial court permitted the laboratory technician who performed the blood test to testify to the incriminating blood alcohol level the test had revealed.... The *Shultz* court stated ...:

"The determination by the Supreme Court in *Schmerber [v. California,* (1966) 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908], that there was no constitutional impediment to drawing a blood sample to determine the physical condition of a suspect provides a basis for Indiana statutes on the subject. I.C. 9–4–4.5–1 provides, *inter alia,* that

'[a]ny person who drives ... a vehicle on the public highways of this state shall be deemed, by virtue of such driving, ... to have given his implied consent to submit to a chemical test for intoxication when asked to submit to such tests by any law enforcement officer.' I.C. 9–4–4.5–2 defines 'chemical test' as including blood tests taken for the determination of the presence of alcohol or a controlled substance. Thus, despite his protestation to the contrary, Shultz did indeed consent to the blood test in question. The gist of his argument going to this issue implies that because the doctor who ordered the blood test did not testify as to a medical necessity for the test, it was taken for the sole purpose of determining Shultz's blood alcohol content. Shultz argues that the search was unlawful because of his lack of consent. Assuming without deciding that there was indeed a 'search' conducted by the doctor, Shultz impliedly consented to that search by driving his car on an Indiana highway. *Clark v. State,* (1978) ([175] Ind.App. [391]) 372 N.E.2d 185; *State v. Hummel* (1977) ([173] Ind.App. [170]) 363 N.E.2d 227, *cert. denied* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978).

439 N.E.2d at 182–83 (quoting *Shultz,* 417 N.E.2d at 1137–38). Thus, even if Troy was unable to voluntarily consent to the taking of the blood sample, he impliedly consented under IC 9–4–4.5–1 (1982) (repealed; for current version, see IC 9–11–4–1 (Supp.1983)).

▮ Another exception to the warrant requirement for search and seizure is recognized where the law enforcement agents conducting the search have probable cause to believe the search will produce evidence that a crime has been committed and such exigent circumstances exist that "the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Arkansas v. Sanders,* (1979) 442

U.S. 753, 759, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235; *see Short v. State,* (1982) Ind., 443 N.E.2d 298, 302–03. In the present case, Officer Noack, who ordered the taking of Troy's blood sample, had probable cause to believe that the sample would produce evidence that Troy had committed the crime of driving while intoxicated, I.C. 9–4–1–54, based on information from Officer Ray that Troy smelled strongly of alcohol and on his own observation of a half-full quart bottle of beer in Troy's car at the scene of the accident. The requisite exigent circumstances were present in the threat of the "metabolic destruction of the evidence" of Troy's intoxication, i.e., the bodily absorption of the alcohol in his bloodstream. *Shultz,* 417 N.E.2d at 1138. Thus, the taking of Troy's blood sample fell within a well established exception to the warrant requirement, and error in the admission of evidence pertaining to Troy's blood sample and the analysis thereof may not be premised on the constitutional grounds of unreasonable search and seizure.[2]

■ Troy next argues that evidence of the blood test should have been suppressed because the taking of the blood sample and analysis thereof were in violation of IC 9–4–4.5–7 (1982) (repealed), which states:

"(a) A physician, or a person under the direction of a physician, who performs a chemical test on blood obtained from another person, shall disclose the results of such a test to any law enforcement officer when a prosecutor or his deputy requests the results as a part of a criminal investigation.

(b) A physician, hospital, or an agent of either is not civilly liable for disclosing test results in accordance with this section.

(c) For the purposes of this section, the privileges arising from a patient-physician relationship do not apply to the test results described in this section, and these test results may be admitted in a criminal proceeding in accordance with the applicable rules of evidence.

(d) The exceptions to the patient-physician relationship specified in subsection (c) do not affect those relationships in any proceedings not covered by this section.

(e) The test results obtained by a law enforcement officer under subsection (a) may only be disclosed to a prosecuting attorney of his deputy for use as evidence in a criminal proceeding.

(f) Nothing in this section requires a physician or person under the direction of a physician to draw blood or perform a chemical test on blood."

Troy seems to argue the effect of this statute is to prevent law enforcement agents from directing hospital personnel to draw a blood sample where the purpose is to have the sample analyzed by and the results divulged to law enforcement officials unless requested by the prosecutor or his deputy. Since Officer Noack, and not a member of the prosecutor's office, ordered the taking of the blood sample, Troy argues, the taking was in violation of IC 9–4–4.5–7.

We disagree. The clear import of this statute is to narrow the scope of the physician-patient privilege by requiring a physician, or one who at a physician's direction performs a blood alcohol test, to divulge the results of the test to a law enforcement officer when requested to do so by a member of the prosecutor's office as part of a criminal investigation. Thus, the statute does not create any rights in a criminal defendant, and, in fact, limits the defendant's right to invoke the physician-patient privilege to prevent the disclosure of blood alcohol test results, which might otherwise be construed as being privileged information. Nothing in the statute indicates it was intended to restrict the ability of a law enforcement official to order hospital per-

---

**2.** In light of our holding that the admission of evidence of the blood test was justified either on the grounds of consent or the existence of probable cause plus exigent circumstances, we need not negate or address Troy's third argument, that the search and seizure could not be justified as incident to a lawful arrest.

sonnel to draw a blood sample for purposes of analysis by a state law enforcement agency.[3] First, the statute refers only to the disclosure of blood test results, not the drawing and analysis of blood samples. Secondly, the interpretation of the statute Troy argues for would intolerably tie the hands of police officers investigating drunk driving cases, requiring them to await the request of a member of the prosecutor's office before requesting that a hospital employee draw a blood sample. We have already noted that the metabolic destruction of evidence in a drunk driving suspect's blood system is an exigent circumstance that, when coupled with probable cause, justifies the taking of a blood sample without a search warrant. *Shultz, supra.* We cannot believe the legislature intended, by this statute, to impose another costly delay in the process of securing a blood sample, while the police officer awaits the prosecutor's request, when the Constitution does not require such a delay for the purpose of obtaining a search warrant. Such a delay would frequently deprive law enforcement officials of the best sort of evidence that the serious crime of driving while intoxicated had been committed. The trial court did not err in refusing to exclude evidence of the blood test on this basis.[4]

Troy's final two grounds for alleging error in the admission of evidence of his blood test are aimed at the trial court's refusal to exclude the testimony of Robert Reed, who analyzed Troy's blood sample, regarding the results of the blood test. Troy argues first that Reed's testimony should have been excluded because the State's evidence of the chain of custody of the container into which Troy's blood sample was placed was insufficient to prove the container was sterile. The implication is that the container *could* have been contaminated at some time, which would have rendered the results of the blood test unreliable and, therefore, inadmissible.

We first note that Troy presented absolutely no evidence that the container actually was contaminated. As our supreme court stated in *Conrad v. State,* (1974) 262 Ind. 446, 449, 317 N.E.2d 789, 791: "The mere possibility that evidence might have been tampered with will not make the evidence totally objectionable." Robert Reed testified that it was his job to prepare the containers provided with the state police department's blood alcohol sample kits. It was his procedure to use containers prepared to be sterile by the manufacturer. Reed placed a powdery chemical substance in the containers that acted as an anticoagulant and preservative of the blood samples. The containers were then sent to the state police quartermaster, who assembled the blood alcohol testing kits (including a container, report forms, and a mailing tube) and distributed them to the various local police departments around

---

3. This conclusion is bolstered by the language of the new version of the statute Troy relies upon, found at IND.CODE § 9–11–4–6 (Supp. 1983), which states in part:
 "(a) A physician, or a person under the direction of a physician, who:
 (1) obtains a blood or urine sample from a person at the request of a law enforcement officer; or
 (2) performs a chemical test on blood or urine obtained from a person;
 shall deliver the sample to a law enforcement officer who requests it, or disclose the results of the test to any law enforcement officer when a prosecuting attorney or his deputy requests the results as a part of a criminal investigation."
 The statute, enacted in 1983, clearly authorizes a law enforcement officer to request hospital personnel to draw a blood sample from a drunk driving suspect and have the sample delivered to him, as Officer Noack did in this case. We regard this as merely a clarification of the intent of the legislature evident in the 1982 version of the law.

4. The rejection of this argument exhausts the grounds for suppression of evidence of the blood test Troy asserted in his motion to suppress. Troy also alleges the trial court erred in refusing to reconsider the motion to suppress following the court's comments made at the hearing on the proposed plea agreement, *see supra* at 14–15. As the discussion to this point indicates, the trial court did not commit error in rejecting the arguments Troy made in support of his motion to suppress. Therefore, it could not have been error for the trial court to refuse to reconsider the motion to suppress.

the state. A hospital employee testified she drew the blood sample from Troy using a sterile syringe and put the sample in a container provided by a police officer. Officer Tobin Ray testified he provided the container from a state police blood alcohol sample kit. He observed a powdery substance in the container that he believed was intended to preserve the blood. Officer Ray placed Troy's blood sample in an envelope in the kit and sealed the envelope. He filled out the forms provided with the kit, indicating that it was Troy Zimmerman's blood and that a blood alcohol content test should be performed on it. Officer Ray placed the entire kit in his locker at the police station and mailed it two days later, on Monday, June 21, 1982, to the state laboratory. Reed testified he received the kit on Wednesday, June 23, and performed the test the following day. This evidence "strongly suggests the whereabouts of the evidence at all times," *Jones v. State,* (1981) Ind., 425 N.E.2d 128, 132, and is, therefore, sufficient to establish a proper chain of custody and a proper foundation for the admission of Reed's testimony. *Id.; see also Conrad, supra.*

Finally, Troy assails the foundation for Reed's testimony regarding the results of Troy's blood test on the ground that the equipment on which the sample was tested had not been inspected and certified within six months prior to the test in question. Troy relies on Department of Toxicology regulation 260 IAC 1–5–2(1) (1979), which states "All chemical test equipment and chemicals shall be certified as to compliance with standards specified in Regulation IIA(5) and IIA(6) [260 IAC 1–5–1(5) and (6)] at least once each six months."

At trial, Robert Reed testified that the equipment on which Troy's blood was tested on June 24, 1982, had last been inspected and certified on June 23, 1981. Based on these facts and the regulation quoted above, Troy argues the State failed to lay a proper foundation for Reed's testimony concerning the results of the blood analysis. The trial court overruled defense counsel's objection to the testimony, but read the jury the following during final instructions (Court's Instruction V(B)):

"In June of 1982, Indiana had a regulation pertaining to equipment that tests alcohol blood content that stated that said equipment shall be inspected and certified at least once each six months. If you find that the State of Indiana failed to comply with this regulation, then such failure may be considered by you, along with the other evidence, in order to reach a verdict as to whether or not the defendant was intoxicated on June 19, 1982."

(R. 698).

In *Shultz v. State, supra,* we decided a closely related issue. There, the defendant, Shultz, who was convicted of driving while intoxicated, alleged the trial court erred in admitting testimony of a laboratory technician regarding the results of a blood alcohol test the technician had performed on a sample of Shultz's blood. Shultz's allegation of error rested on the premise that Department of Toxicology regulation 260 IAC 1–4–2 (1979) required certification of chemical test operators "who analyze blood, urine or body materials other than breath," and that the technician who testified at his trial had not been certified. We rejected this argument, stating:

"In 1976, the State Department of Toxicology promulgated regulations requiring the certification of chemical test operators 'who analyze blood, urine or body materials.' 260 IAC 1–4–2. Those regulations were promulgated pursuant to statutory authority found at I.C. 9–4–4.–5–6. In 1976, at the time the regulation in question was promulgated, I.C. 9–4–4.–5–6 appeared to include *all* types of chemical test operators. The statute was amended in 1978, however. As amended, it specifically discusses *only* the certification of breathalyzer test operators. By amending the statute to narrow its scope the legislature clearly intended to, and did, include only breathalyzer operators and test devices under the statute. That hoary maxim of statutory interpretation, *expressio unius est*

*exclusio alterius,* works against Shultz, as does the elementary principle of administrative law that an administrative agency or department can only promulgate regulations which fall within the scope of the agency's enabling legislation. This has long been true in Indiana ... By its failure to amend its regulations consistent with the restriction of the scope of the enabling legislation under which they were originally promulgated, an agency cannot retain power which it has lost through legislative amendment. While this court recognizes that the delegation of legislative power is necessary for the effectiveness of modern government, K. Davis, *Administrative Law Text* (3d ed. 1972) § 1.02 at 3–4, we also recognize that the legislature's prerogative to control that power should be assiduously respected.

Accordingly, we conclude that the 1978 amendment of I.C. 9–4–4.5–6 to include only breathalyzer operators and machinery under the Department of Toxicology certification program implicitly limited the broader scope of the administrative regulations which had been passed under the earlier enabling legislation. Consequently, Shultz cannot rely upon an outdated regulation, 260 IAC 1–4–2, to exclude the testimony of the uncertified toxicology analyst."

*Shultz,* 417 N.E.2d at 1135–37 (footnotes omitted).

▮▮▮▮ Regulation 260 IAC 1–4–2 and the regulation Troy relies upon, 260 IAC 1–5–2, are closely related in that the former concerns the certification of chemical test operators who analyze body materials other than breath, while the latter concerns the inspection and certification of equipment and chemicals used to analyze body materials other than breath.[5] For the reasons stated in *Shultz, supra,* we hold that the 1978 amendment to IC 9–4–4.5–6 renders 260 IAC 1–5–2 out of date and ineffective to exclude testimony of blood test results performed on equipment that was not timely inspected and certified. Because Reed, an experienced chemical test operator thoroughly familiar with the equipment on which Troy's blood was analyzed, testified that the equipment was in good operating order at the time Troy's blood was tested, the trial court was within its discretion in admitting Reed's testimony regarding the results of the blood analysis. *See Shultz,* 417 N.E.2d at 1137.

For all of the foregoing reasons, we hold the trial court did not err in admitting evidence of the test performed on Troy's blood.

## II.

Troy next alleges the trial court erred in refusing to instruct the jury in accordance with his Tendered Instruction Number 17, which stated:

"You are instructed that in your consideration of the result of an alcohol analysis of a sample of blood extracted from Troy Zimmerman and the weight you give to such blood alcohol percentage, that there was in force and effect at all times relevant to this matter, 260 Indiana Administrative Code, Section 1–5–2, which required that equipment and chemicals used in performing such tests shall be inspected and certified at least once each six months, as to compliance with

---

**5.** The Department of Toxicology rules and regulations are organized in the following way: Rule 1 (260 IAC 1–1–1 to –3) governs the training and certification of chemical test operators analyzing *breath;* Rule 2 (260 IAC 1–2–1 to –3) governs the inspection and certification of chemical testing equipment used to analyze *breath;* Rule 3 (260 IAC 1–3–1) governs the standards for the operation of chemical test equipment used to analyze *breath;* Rule 4 (260 IAC 1–4–1 to –2) governs the training and certification of chemical test operators analyzing body materials *other than breath;* and Rule 5 (260 IAC 1–5–1 to –3) governs the inspection and certification of chemical testing equipment used to analyze body materials *other than breath.* The effect of our holding today and the holding in *Shultz, supra,* is to render the requirements of 260 IAC 1–4–1 through 1–5–3 ineffective to prevent the admission of alcohol-related test results obtained from blood, urine or body materials other than breath, even if the state has failed to comply with those regulations. The 1983 amendment to the implied consent law, *see* IC 9–11–4–1 to –15 (Supp.1983) would not appear to change this result.

standards specified and regulations promulgated by the State Department of Toxicology of Indiana University School of Medicine.

You are further instructed that in your consideration of such evidence and the weight to be given thereto, you may consider the State of Indiana's failure to comply with such rule and regulation, as there had been no inspection or certification of the equipment and chemicals used in performing the analysis of said sample of blood taken from Troy Zimmerman's body since June 23, 1981."

(R. 105). In our preceding discussion, we have quoted the court's instruction V(B), which the trial court gave in place of Troy's instruction. *See supra* at 19. Quoting *Hedrick v. State*, (1951) 229 Ind. 381, 389, 98 N.E.2d 906, 910, Troy asserts:

"A party has a right to insist that the court shall instruct the jury specifically on all legal questions necessary to enable them to reach a true verdict, and to have the instructions made so specific as to apply to the facts of the particular case as developed by the evidence."

Troy argues the court's instruction failed to be so specific as to apply to the facts of his case because it, unlike his Tendered Instruction Number 17, omitted the citation of the Department of Toxicology regulation in question and the date on which the blood testing equipment last had been inspected and certified prior to the test of his blood.

 As our supreme court has stated: "In determining whether an instruction has been properly refused, we must determine:

'(1) whether the instruction correctly states the law, (2) whether there is evidence in the record to support the giving of the instruction, [and] (3) whether the substance of the tendered instruction is covered by other instructions which are given.' *Davis v. State*, (1976) 265 Ind. 476, 478, 355 N.E.2d 836, 838 [citations omitted]."

*Spears v. State*, (1980) 272 Ind. 634, 638, 401 N.E.2d 331, 334.

 In light of our holding, *supra*, that regulation 260 IAC 1–5–2 is beyond statutory authorization, Troy was not entitled to his instruction, because it was not a correct statement of the law. But even if it were, Troy's argument must fail because the substance of his Tendered Instruction Number 17 was covered by the court's Instruction V(B). Troy apparently reads the rule in *Hedrick, supra,* to require an instruction to be so specific that it actually states the facts of the case relevant to the instruction in question. There is no such requirement. The instruction given by the trial court accurately informed the jury of the requirements of 260 IAC 1–5–2 and told the jury it could consider the failure of the State, if it found such failure, to comply with the regulation in reaching its verdict. The failure of the court's instruction to cite the regulation in question is immaterial, as is its failure to mention the date on which the blood testing equipment was last certified, since the jury received that information from Robert Reed's testimony. The instruction given by the trial court was more than a mere abstract proposition of law condemned in some of our cases. *See, e.g., Hotz v. Gelsthorpe,* (1979) 180 Ind.App. 24, 27, 387 N.E.2d 78, 80. Because the substance of Troy's tendered instruction was covered by the instruction given by the court, it was not error for trial court to refuse the Tendered Instruction Number 17. *Spears, supra.*

### III.

 Finally, Troy challenges the jury's verdict, and the judgment entered thereon, as being unsupported by the evidence. Our standard of review where the sufficiency of the evidence is challenged dictates that we will not reweigh the evidence nor judge the credibility of the witnesses; we will look to the evidence most favorable to the verdict and the reasonable inferences that can be drawn therefrom; and we will affirm the verdict if there is substantial evidence of probative value to support each element of the offense in question. *Booth v. State,* (1981) Ind.App., 416 N.E.2d 911,

912. Troy appeals his conviction for driving while intoxicated, under IND.CODE section 9–4–1–54 (1982).[6] Subsection (b) states that this statute is violated when a person "operates a vehicle while intoxicated." Subsection (a) states that " 'intoxicated' means under the influence of: (1) alcohol ... such that there is an impaired condition of thought and action and the loss of normal control of one's faculties to such an extent as to endanger any person."

Robert Reed's testimony, which we have held was properly admitted into evidence, was that his analysis of Troy's blood sample revealed a blood alcohol content of .19%. Evidence of a blood alcohol content of .10% or more constitutes prima facie evidence of intoxication. IC 9–4–1–54(g)(1). In addition, Rick Zimmerman testified to the substantial quantities of beer and schnapps he and Troy consumed during the day of June 19, 1982. The owner of the service station to which Rick and Troy returned after visiting the lake saw Troy stumble when he got out of his car about 90 minutes before Troy's auto accident. Three witnesses testified that they observed a black Camaro, like the one Troy was driving, being driven in an erratic manner shortly before the accident, and one of these witnesses identified Troy as the driver. Immediately after the accident, Officer Ray smelled a strong odor of alcohol on Troy, and he testified to his belief that Troy was intoxicated at that time. Finally, Officer Noack testified that he found a half-full quart bottle of beer on the front floorboard of Troy's wrecked automobile. This evidence is sufficient to support the jury's verdict that Troy was guilty of driving while intoxicated. *Cf. Booth, supra.*

The judgment of the trial court is affirmed.

CONOVER and YOUNG, JJ., concur.

---

6. Troy does not challenge the sufficiency of the evidence to support the finding of the jury, in the second phase of his trial, that this conviction was his second for driving while intoxicated after June 30, 1978, enhancing the present offense to a Class D felony. *See* IC 9–4–1–54(b)(1).